# LONG ISLAND WATER SUPPLY COMPANY *v.* BROOKLYN.

**ERROR TO THE SUPREME COURT OF THE STATE OF NEW YORK.**

No 216.' Argued March 17, 18, 1897. — Decided April 16, 1897.

In cases brought here from state courts their decisions are final in matters of procedure, and on alleged conflicts between the statutes of the State and its constitution.

An existing system of water supply in a municipality which is the property of private individuals and is operated under a contract with the municipal corporation for furnishing it with a portion of its needed supply of water under rates fixed by the contract, is private property which may be acquired by the public, in the exercise of the power of eminent domain, on the payment of a just compensation, including compensation for the termination of the contract.

In condemnation proceedings for that purpose, the assessment of damages may be made by commissioners where the statutes so provide, and there is no denial of due process of law in making their findings final as to the facts, leaving open to the courts the inquiry whether there was any erroneous basis adopted by the commissioners in their appraisal, or other errors in their proceedings.

There was nothing in the statute under which the Long Island Water Supply Company was organized, nor in its contract with the town of New Lots for the supply of water, nor in the act of annexation to Brooklyn, which gave to that company rights exclusive and beyond the reach of such legislative action.

UNDER authority of chap. 737 of the laws of New York for 1873, (Laws N. Y. 1873, p. 1100), as amended in 1881 (Laws N. Y. 1881, chap. 321, p. 443), the plaintiff in error was organized as a water company. On September 15, 1881, it entered into a contract with the town of New Lots, by which it agreed to lay water pipes and mains in the streets of New Lots, and supply the town with water. The town, on the other hand, agreed to pay for hydrants to be furnished and supplied, as provided in the contract, at a specified rate per hydrant, the number of hydrants to be not less than 200. The term of the contract was twenty-five years. This contract was modified on July 2, 1885, but the modification contains nothing material to this controversy.

In 1886, by chap. 335 (Laws N. Y. 1886, p. 540), the town of New Lots was annexed to and merged in the city of Brooklyn, to be known thereafter as the 26th ward of said city.

The fourth section of this act provided, among other things, that "the amount annually payable by said town for water supplied to it under existing contracts between it and the Long Island Water Supply Company, shall, after this act takes effect, during the terms of said contract, or until said city shall purchase or acquire the property of said water company, as in the next section provided, be levied and collected

from the property situated and taxable within the territory hereby annexed, and such amount shall be paid to the said water company by said city as it falls due from time to time under said contracts, and the said city of Brooklyn shall not distribute or furnish water for consumption or use within said territory, or lay any pipes or mains for the distribution or supply of water within said territory, until the expiration of the charter of said company or until the said city shall purchase or acquire the property of said company as in the next section provided."

By section 5 the city was given power to purchase or condemn the property of the company within two years, but did neither. In 1892 the legislature passed another act (Laws 1892, chap. 481, p. 960), authorizing the city of Brooklyn to condemn the property of the company, the first section of which is as follows:

"SECTION 1. The public interest requires the acquisition, by the city of Brooklyn, for the public use of the reservoir, wells, machinery, pipes, franchises and all other property of the Long Island Water Supply Company, and the said city of Brooklyn is hereby authorized to acquire the same for such use by condemnation, free of all liens and incumbrances whatsoever, provided that the proceedings herein, hereinafter and hereby authorized, shall be commenced within one year after the passage of this act."

Subsequent sections prescribed the procedure. Proceedings were had under this act. The commissioners appointed, as provided therein, valued the property of the company at $570,000, of which $370,000 was named as the value of the tangible property, and $200,000 that of the franchises, contracts and all other rights and property of whatsoever nature or kind of the company, including therein the contract between the town of New Lots and the company. The special term of the Supreme Court, on June 29, 1893, made an order vacating and setting aside this report and appointing new commissioners. The city of Brooklyn appealed to the general term of that court, which, on December 1, 1893, reversed the order of the special term and confirmed the report of the com-

missioners. The company then took an appeal to the Court
of Appeals. That court affirmed the decision of the general
term, 143 N. Y. 596, and remitted the record to the Supreme
Court, which court, on December 4, 1894, entered final judg-
ment in favor of the city of Brooklyn, and thereupon this writ
of error was sued out.

*Mr. John F. Dillon* and *Mr. Benjamin F. Tracy* for plain-
tiff in error. *Mr. Harry Hubbard* and *Mr. John M. Dillon*
were on their brief.

*Mr. George G. Reynolds* and *Mr. Albert G. McDonald* for
defendant in error.

MR. JUSTICE BREWER, after stating the case, delivered the
opinion of the court.

So far as respects any mere matter of procedure, or of
conflict between the statute authorizing the condemnation
or the proceedings had thereunder and the constitution of
the State, the decision of the Court of Appeals is conclusive.
*West River Bridge Company* v. *Dix*, 6 How. 507; *Bucher* v.
*Cheshire Railroad*, 125 U. S. 555; *Adams Express Company*
v. *Ohio*, 165 U. S. 194. Our inquiry must be directed to the
question whether any rights of the water supply company
secured by the Constitution of the United States have been
violated. The contention of plaintiff in error is that the
proceedings had under the statute which resulted in the
judgment of condemnation violate section 10, article 1, of
the Constitution of the United States, which forbids any
State to pass a law impairing the obligation of contracts,
and were not "due process of law," as required by the
Fourteenth Amendment.

With reference to the first part of this contention it is said
that in 1881 the town of New Lots made a contract with the
water supply company by which for each and every year dur-
ing the term of twenty-five years it covenanted to pay to the
company so much per hydrant for hydrants furnished and sup-
plied by it; that the act of annexation continued the burden

of this obligation upon the territory within the limits of the town, although thereafter the town as a separate municipality ceased to exist, and the territory became simply a ward of the city of Brooklyn; that the condemnation proceedings destroyed this contract and released the territory from any obligation to pay the stipulated hydrant rental; that a State or municipality cannot do indirectly what it cannot do directly; that as the municipality could not by any direct act release itself from any of the obligations of its contract, it could not accomplish the same result by proceedings in condemnation. We cannot yield our assent to this contention. All private property is held subject to the demands of a public use. The constitutional guarantee of just compensation is not a limitation of the power to take, but only a condition of its exercise. Whenever public uses require, the government may appropriate any private property on the payment of just compensation. That the supply of water to a city is a public purpose cannot be doubted, and hence the condemnation of a water supply system must be recognized as within the unquestioned limits of the power of eminent domain. It matters not to whom the water supply system belongs, individual or corporation, or what franchises are connected with it — all may be taken for public uses upon payment of just compensation. It is not disputed by counsel that, were there no contract between the company and the town, the water works might be taken by condemnation. And so the contention is practically that the existence of the contract withdraws the property, during the life of the contract, from the scope of the power of eminent domain, because taking the tangible property will prevent the company from supplying water, and, therefore, operate to relieve the town from the payment of hydrant rentals. In other words, the prohibition against a law impairing the obligation of contracts stays the power of eminent domain in respect to property which otherwise could be taken by it. Such a decision would be far reaching in its effects. There is probably no water company in the land which has not some subsisting contract with a municipality which it supplies, and within which its works are located,

and a ruling that all those properties are beyond the reach of the power of eminent domain during the existence of those contracts is one which, to say the least, would require careful consideration before receiving judicial sanction.    The fact that this particular contract is for the payment of money for hydrant rental is not vital.    Every contract is equally within the protecting reach of the prohibitory clause of the Constitution.    The charter of a corporation is a contract, and its obligations cannot be impaired.    So it would seem to follow, if plaintiff in error's contention is sound, that the franchises of a corporation could not be taken by condemnation, because thereby the contract created by the charter is impaired.    The privileges granted to the corporation are taken away, and the obligation of the corporation to perform is also destroyed.

The vice of this argument is twofold.    First, it ignores the fact that the contract is a mere incident to the tangible property ; that it is the latter which, being fitted for public uses, is condemned.    And while the company, by being deprived of its tangible property, is unable to perform its part of the contract, and therefore can make no demands upon the town for performance on its part, it still is true that the contract is not the thing which is sought to be condemned, and its impairment, if impairment there be, is a mere consequence of the appropriation of the tangible property.    Second, a contract is property, and, like any other property, may be taken under condemnation proceedings for public use.    *New Orleans Gas Co.* v. *Louisiana Light Co.*, 115 U. S. 650, 673.    Its condemnation is of course subject to the rule of just compensation, and that is all that is implied in the decisions such as *Hall* v. *Wisconsin*, 103 U. S. 5, cited by counsel.    In that case it appeared that Hall had a contract with the State for services entered into in pursuance of a statute, that he performed the services, but that before finishing his work the legislature repealed the statute authorizing the contract.    It was held that he was nevertheless entitled to his stipulated compensation.    The act of the legislature in the repeal was not one providing for condemnation, and in so far as it partook of the

nature of a condemnation it ignored the obligation of just compensation, and was therefore void; but it was not held that, if just compensation had been provided and a public use required, the contract might not have been condemned.

The true view is that the condemnation proceedings do not impair the contract, do not break its obligations, but appropriate it, as they do the tangible property of the company, to public uses. The statute under which these proceedings were had declares the necessity of the acquisition "for the public use of the reservoir as well as machinery, pipes, franchises and all other property" of the company, and the application for the appointment of commissioners not only described the tangible property but also added "all franchises, contracts, more particularly a certain contract dated the 15th day of September, 1881, between the town of New Lots and the said Long Island Water Supply Company, and referred to in chap. 335, Laws of 1886, and all other rights and property of whatsoever nature or kind as the same may so appear." The commissioners, after a hearing, valued first the tangible property at $370,000 and the franchises, contracts and all other rights and property, including this particular contract, at $200,000. In other words, the condemnation proceedings did not repudiate the contract but appropriated it and fixed its value. The case of *West River Bridge Co.* v. *Dix*, 6 How. 507, is in point. The bridge company had a charter from the State of Vermont creating it a corporation and investing it with the exclusive privilege of erecting a bridge over West River within four miles of its mouth and with the right of taking tolls for passing the same. Under that authority it had erected its bridge and was in the enjoyment of the franchise. During the life of the charter, and under authority of an act of the legislature, condemnation proceedings were taken for the purpose of condemning the bridge and extinguishing the charter; converting the former into a free public highway. These proceedings culminated in an award of compensation and a judgment of condemnation. The Supreme Court of the State having sustained the proceedings they were brought to this court on error, and there as here the

contention was that the proceedings were in violation of the tenth section of the first article of the Constitution. This contention was overruled, and in the course of the opinion it was observed :

"No State, it is declared, shall pass a law impairing the obligation of contracts; yet, with this concession constantly yielded, it cannot be justly disputed, that in every political sovereign community there inheres necessarily the right and the duty of guarding its own existence, and of protecting and promoting the interests and welfare of the community at large. This power and this duty are to be exerted not only in the highest acts of sovereignty, and in the external relations of governments; they reach and comprehend likewise the interior polity and relations of social life, which should be regulated with reference to the advantage of the whole society. This power, denominated the eminent domain of the State, is, as its name imports, paramount to all private rights vested under the government, and these last are, by necessary implication, held in subordination to this power, and must yield in every instance to its proper exercise. . . . Now it is undeniable, that the investment of property in the citizen by the government, whether made for a pecuniary consideration or founded on conditions of civil or political duty, is a contract between the State, or the government acting as its agent, and the grantee; and both the parties thereto are bound in good faith to fulfil it. But into all contracts, whether made between States and individuals, or between individuals only, there enter conditions which arise not out of the literal terms of the contract itself; they are superinduced by the preëxisting and higher authority of the laws of nature, of nations or of the community to which the parties belong; they are always presumed, and must be presumed, to be known and recognized by all, are binding upon all, and need never, therefore, be carried into express stipulation, for this could add nothing to their force. Every contract is made in subordination to them, and must yield to their control, as conditions inherent and paramount, wherever a necessity for their execution shall occur. Such a condition is the right of eminent domain. This right

does not operate to impair the contract affected by it, but recognizes its obligation in the fullest extent, claiming only the fulfilment of an essential and inseparable condition. . . . A distinction has been attempted, in argument, between the power of a government to appropriate for public uses property which is corporeal, or may be said to be in being, and the like power in the government to resume or extinguish a franchise. The distinction, thus attempted, we regard as a refinement which has no foundation in reason, and one that, in truth, avoids the true legal or constitutional question in these causes; namely, that of the right in private persons, in the use or enjoyment of their private property, to control and actually to prohibit the power and duty of the government to advance and protect the general good. We are aware of nothing peculiar to a franchise which can class it higher, or render it more sacred, than other property. A franchise is property and nothing more; it is incorporeal property, and is so defined by Justice Blackstone, when treating, in his second volume, c. 3, p. 20, of the Rights of Things." See also *The Richmond &c. Railroad Company* v. *The Louisa Railroad Company*, 13 How. 71, 83; *Boston & Lowell Railroad* v. *Salem & Lowell Railroad*, 2 Gray, 1, 35, 36.

The views thus expressed have never been overruled, and we think are controlling of this case. Counsel seek to distinguish that case from this in that here, as they say, there is an' executory contract for 25 years, whereas in that case there was only incorporeal property, the result of an executed grant; here the use of the water works property is not changed, whereas there the bridge was converted from a toll into a free bridge, and they quote some remarks made by Mr. Justice McLean, in a concurring opinion in respect to this matter, p. 537, as follows:

" No State could resume a charter, under the power of appropriation, and carry on the functions of the corporation. A bank charter could not be thus taken, and the business of the bank continued for public purposes. Nor could this bridge have been taken by the State, and kept up by it, as a toll bridge. This could not be called an appropriation of private

property to public purposes. There would be no change in the use, except the application of the profits, and this would not bring the act within the power. The power must not only be exercised *bona fide* by a State, but the property, not its product, must be applied to public use. . . . The use of this bridge, it is contended, is the same as before the act of appropriation. The public use the bridge now as before the act of appropriation. But it was a toll bridge, and by the act it is made free. The use, therefore, is not the same. The tax assessed on the citizens of the town, to keep up and pay for the bridge, may be impolitic or unjust; but that is not a matter for the consideration of this court."

We do not think the differences between the cases such as to affect the right of condemnation. A charter is not simply an executed grant but a continuing contract. There is a duty of performance by the recipients of the grant which continues during the life of the charter. Neither can the power of the State to condemn a water works system depend upon the question whether it makes the supply of water absolutely free to all individuals who desire to use it. The State, which, in the first place, has the power to construct a water supply system and charge individuals for the use of the water, may condemn a system already constructed, and continue to make such charge. This is not turning property from one private corporation to another, but taking property from a private corporation and vesting the title in some municipal corporation for the public use. It is not essential to a public use that it be absolutely free and without any charge to any one. The State may build a railroad and charge tolls for passengers and freight. It is, nevertheless, a public function which it is exercising, and the property is devoted to public uses. And so wherever there is cost in continuing a public work the State has a right to demand compensation for any individual use and personal benefit therefrom.

Neither can it be said that there was not "due process of law" in these condemnation proceedings. It is not essential that the assessment of damages be made by a jury. Such award may be made by commissioners, at least where there is

provision for a review of their proceedings in the courts. *Central Branch Union Pacific Railroad* v. *Atchison, Topeka & Santa Fé Railroad*, 28 Kansas, 453, 463; Cooley on Const. Lim. 563. And sections 9 and 10 of the act of 1892, under which these proceedings were had, require that the commissioners make and file a report of their proceedings and determination in the Supreme Court of the county of Kings, and that application must be made to that court for a confirmation of the report; that notice of such application must be given; and that "upon such application the court may confirm the report, or may set it aside for irregularity, or for error of law in the proceedings before the commissioners, or upon the ground that the award, in part or in whole, is excessive, or is insufficient;" and appeal was allowed from the decision of that court to a higher. We do not question the proposition that form is not the only thing essential to due process. We said in the recent case of *Chicago, Burlington & Quincy Railroad* v. *Chicago*, 166 U. S. 226, "The mere form of the proceeding instituted against the owner, even if he be admitted to defend, cannot convert the process used into due process of law, if the necessary result be to deprive him of his property without compensation."

It may be true, as contended, that, as construed by the Court of Appeals, the determination of the commissioners is conclusive as to the mere value of the property, but there is no denial of due process in making the findings of fact by the triers of fact, whether commissioners or a jury, final as to such facts, and leaving open to the courts simply the inquiry as to whether there was any erroneous basis adopted by the triers in their appraisal, or other errors in their proceedings.

The error charged against the commissioners in respect to their basis of valuation is that they failed to regard the company as possessed of exclusive rights. It is said by counsel in their brief that the company had, by virtue of its contract and the act of annexation, "two vested rights as against the city of Brooklyn: 1st. A vested right resting in contract to continue to supply water under and pursuant to the said contracts with the town of New Lots 'during the term of said

contracts'; that is, for the unexpired period of said contracts —
about fourteen years. 2d. A further vested right resting in
contract and valid legislative enactment to enjoy its franchises
until the expiration of its charter, protected from any rivalry
on the part of the city of Brooklyn."

The view taken by the majority of the commissioners is thus
stated in their report:

" To recapitulate what has just been said, we have valued
the franchise upon the assumptions (1) that at present the
water company alone has the right publicly to purvey water
in the Twenty-sixth ward; (2) that the exclusiveness now in-
cident to its right may at any time be taken from it by the
legislature, or by local authorities acting under legislation;
but (3) that neither the legislature nor local authorities would,
in determining whether to take from the company the exclu-
siveness of its right, fail to have such due regard as is
demanded by ample and fair public policy, to the past invest-
ment, risks and services of the company and to the reasonably
just expectations which those who have invested money in its
work had in mind when so investing."

The Court of Appeals held that neither the statute under
which the company was organized, nor the contract, nor the
act of annexation, gave to the company rights exclusive and
beyond the reach of legislative action. These conclusions of
the Court of Appeals are vigorously challenged in the argu-
ment, but we are of opinion that they are correct. The stat-
ute simply provided for the organization of water companies.
The contract in terms contained no words of exclusion. It
gave to the company the privilege of laying its mains in the
streets of the town, and contained a covenant on the part of
the town to pay certain hydrant rentals. But grants from the
public are strictly construed in favor of the public, and grants
of a privilege are not ordinarily to be taken as grants of an
exclusive privilege. *Charles River Bridge Co.* v. *Warren
Bridge*, 11 Pet. 420; *Turnpike Co.* v. *State*, 3 Wall. 210; *Stein
v. Bienville Water Supply Co.*, 141 U. S. 67; *Hamilton Gas-
light & Coke Co.* v. *Hamilton*, 146 U. S. 258; *Syracuse Water
Co.* v. *Syracuse*, 116 N. Y. 167. Nor is there anything in the act

of annexation which made a contract or created a right beyond the power of the legislature to change. It gave the city the right to purchase or condemn at any time within two years, but this specification of time did not operate to prevent the legislature from enlarging the time, or from granting at any subsequent period during the life of the contract a further right of purchase or condemnation. No consent was asked of the town company in the act of annexation; it entered into no new contract; nothing was done to enlarge the rights which it had against the public. The act was simply one of legislative discretion in respect to municipal organization, and, like any other such act, subject to future modification by the legislature.

Neither can the act of 1892 be adjudged in conflict with the Federal Constitution because it fails expressly and in detail to prescribe the uses to which the property shall be put by the city of Brooklyn after the condemnation. The property condemned was not vacant land susceptible to a multitude of uses. The character of its use had already been determined by the action of the company. It was already used for public purposes, and the condemnation simply took the title away from the private corporation and vested it in the municipality. And the statute cannot be adjudged unconstitutional because it did not in terms declare that the city of Brooklyn should continue the same use or appropriate the property to some other equally public purpose.

These are the vital questions in the case. We see no error in the judgment, and it is, therefore,

*Affirmed.*

MR. JUSTICE PECKHAM took no part in the decision of this case.