**MAX HALECK, SR., Plaintiff**

v.

**TIUMALU TAIMANE, the Matai of the Tiumalu Family individually and in her capacity as a matai, Defendant**

No. 3-1959

High Court of American Samoa

Civil Jurisdiction, Trial Division

March 4, 1959

Heard at Fagatogo on February 19, 1959, before MOR-ROW, *Chief Judge*, and APE and TAUALA, *Associate Judges*.

Max Haleck, Sr., *pro se.*

Bernard K. Trask, counsel for Tiumalu Taimane.

OPINION OF THE COURT

MORROW, *Chief Judge.*

Plaintiff Haleck filed his petition praying for specific performance of a covenant for renewal of a lease from Tiumalu Male to Ho Ching dated November 1, 1938, for a term of 20 years computed from the 3rd day of February, 1939, at a monthly rental of $30.00. It contained an option by the lessee for a renewal for another 20 years upon the same terms, except that the rental was to be $35.00 a month. The lessor was the matai of the Tiumalu Family. The leased land was that which was then and still is occupied by the plaintiff's No. 1 store in Fagatogo. The store building itself was owned by Ho Ching separate and apart from the land and was not included in the property leased.

Defendant Tiumalu Taimane, the present matai of the Tiumalu Family, filed a counterclaim praying for (a) an order declaring the lease void and rescinded or, in the alternative, (b) an order declaring the option for renewal contained in the lease void and rescinded or that it be "amended to make such provision as to the Court seems fair and just."

Ho Ching died in July, 1953. Subsequent to his death his heirs-at-law assigned the lease and sold the store building

382

to the plaintiff for $7,000. Tiumalu Male died in 1952. The Tiumalu title was vacant until 1956 when the defendant Tiumalu Taimane became the Tiumalu.

In September, 1919, Tiumalu Lailai, the then matai of the Tiumalu Family, leased a portion of the land covered by the lease now in litigation to Ho Ching for 15 years at a yearly rental of $84.00. In September, 1925, the same parties entered into a new lease for 15 years from September 1, 1925, at a yearly rental of $240.00. Tiumalu Lailai died in 1937 and Tiumalu Male succeeded him as the matai of the Tiumalu Family.

We think, since the lease of November 1, 1938 executed by Tiumalu Male (the successor in title to Lailai) to Ho Ching included all the land leased in September, 1925 to Ho Ching, that the September, 1925 lease was surrendered by operation of law despite the fact that it had 22 months yet to run. We think, too, that the fact that some land was included in the second lease which was not included in the first lease is not material on the question of surrender. A new lease to the original tenant of the same premises operates as a surrender of the old lease by operation of law unless it is contrary to the intention of the parties. 51 C.J.S. 715. There was no evidence of a contrary intent in the instant case.

Defendant claims that the November 1, 1938 lease from Tiumalu Male to Ho Ching was void upon the alleged ground that Male had no authority to make the lease because of a contract entered into between Tiumalu Family members on July 30, 1926. It appears that at that time there were three outstanding leases on various parts of Tiumalu communal family land in Fagatogo; viz., one to Ho Ching on which there was a store then occupied by Alexander Forsythe (the land covered by that lease is covered by the November 1, 1938 lease from Tiumalu Male to Ho Ching); another of land on which B. F. Kneubuhl had a

store; and another of land on which Frank Shimasaki had a store.

It is claimed by the defendant that this agreement operated to partition the ownership of a part of the communal family land of the Tiumalu so that the part leased to Ho Ching became the property of Tiumalu Lailai and his heirs, the part on which the Kneubuhl store was located became the property of Male and certain others in the Tiumalu Family while the part on which Frank Shimasaki's store was located became the property of Taamu and certain others in the same family.

The parts of the document necessary to its proper interpretation read as follows:

"WHEREAS the Matai name Tiumalu is owner of certain lands in Fagatogo, bordering on the Naval Station, which lands are named 'Poata,' and whereas the present descendants of Tiumalu are, in addition to the present holder of the name Tiumalu-Lailai, the persons whose names are mentioned in the preamble hereof, and

"WHEREAS certain parts or parcels of the said lands 'Poata' are now leased for the purposes of stores under written leases with Ho Ching and Frank Shimasaki, said leases being of the lands now occupied by the stores of Alexander Forsythe, B. F. Kneubuhl and Frank Shimasaki, and the parties to this agreement desire that the said lands be so partitioned among themselves and their heirs that the proceeds of said several leases in the way of rents and profits shall accrue to those members of said family to whom they are hereby partitioned, and who shall hereafter be regarded as the owners of said leases and entitled to the rents and profits received therefrom, but shall not have the power to dispose of said lands by sale so as to take them out of the ownership of the Matai of the family.

"NOW THEREFORE in consideration of the premises and of the sum of One ($1) Dollar to each of the parties by the others in hand paid, the receipt whereof is hereby acknowledged, it is mutually agreed as follows:

"1. Male, Faamao, Falo and Viavia and their heirs and Fuamaila, Talaifua and Tusi shall be the owners for the purpose of receiving the rents of the lease as hereinbefore stated of the property now occupied by B. F. Kneubuhl.

384

"2. Taamu and his heirs and Mariota, Toso and Faataape and Saufaiga and their heirs shall be the owners for the purpose of receiving the rents and profits of the lease to Frank Shimasaki.

"3. Tiumalu-Lailai and his heirs shall be the owners for the purpose of receiving the rents and profits from the lease of the property now in the possession of Alexander Forsythe.

"4. It is hereby covenanted and agreed by and between all the parties to this agreement that the partition of the lands as made herein is only for the purpose of receiving the rents, issues and profits of the lands and properties hereby partitioned and that the ownership of the lands remains in the Matai of the Tiumalu family.

"5. Male shall collect the rents of the property now occupied by B. F. Kneubuhl.

"Taamu shall collect the rents of the property now occupied by Frank Shimasaki.

"Tiumalu La'ila'i shall collect the rents of the property now occupied by Alexander Forsythe.

"In the event that the persons named as collectors of rents of these properties are by reason of illness or absence unable to collect the rents then they shall designate in writing the one to act as their substitute."

We think that the contract properly construed means that the money from the three leases was to be divided but the ownership of the land was to remain in the matai. The recital contained in the second quoted paragraph is somewhat ambiguous. However, it is to be remembered that recital is not strictly a part of a contract, though it may be looked to for interpretation. If there is inconsistency between the recital and the operative parts, the operative parts control. "Recitals in a contract should be reconciled with the operative clauses and given effect, so far as possible; but where the recital is so inconsistent with the covenant or promise that they cannot be harmonized, the latter if unambiguous prevails. In other words, recitals, especially when ambiguous, cannot control the clearly expressed stipulations of the parties, and where the recitals are broader than the contract stipulations, the former will not extend the latter." 17 C.J.S. 733. To the same

effect is the opinion in Ex parte Dawes, 17 Q.B.D. 275, 286, quoted with approval in *Williams v. Barkely*, 165 N.Y. 48, 59, 58 N.E. 765, 767.

We think that the operative parts of the contract contained in sub-paragraphs 1, 2, 3, 4 and 5 of the third quoted paragraph taken as a whole clearly mean that it was only the rent, not the ownership of the land, that was to be divided. As stated at the end of sub-paragraph 4, "The ownership of the lands remains in the Matai of the Tiumalu Family." If there is any inconsistency between the recital and the operative parts in the contract, the operative parts must prevail because the operative parts are what the parties agreed to do while the recital is merely the inducement for making the contract. As we have said, recital is not strictly a part of a contract unless intended to be so. 17 C.J.S. 733. And there was no evidence of any such intention here.

Again paragraph 4 of the operative parts of the agreement provides that "It is hereby covenanted and agreed by and between all the parties to this agreement that the partition of the lands as made herein is only for the purpose of receiving the rents, issues and profits of the lands and properties hereby partitioned and that the ownership of the lands remains in the Matai of the Tiumalu Family." Nowhere in either the recitals or in the operative clauses does the contract say that the partition is for the purpose of dividing ownership.

The English word partition is derived from the Latin word *partitio* which means a division. A division or partition of a piece of land may obviously be made for any one of many purposes. A farmer may partition or divide his farm into three fields by fences for the purpose of raising cattle in one field, sheep in another, and pigs in the third. No one would contend that such partition or division of

the land operated to divide its ownership. He still owns the farm just as the matai continued to own the land after it was divided for the purpose of receiving rent money. The defendant is trying to read the words "partition of the lands" as if they read "partition or division of ownership of the lands." The operative part of the agreement does not say "partition or division of ownership of lands" at all. It says, instead, "partition of the lands as made herein is only for the purpose of receiving the rents, issues and profits" and the "ownership of the lands remains in the matai." Just as the farmer, as we have said, may partition (divide) his land for the purpose of growing cattle on one part, sheep on another part, and pigs on the third part, so the owner may partition (divide) his land for the purpose of allowing one son to get the rent from one part, another son from another part, and a third son from the third part. No one would suggest by such a division of rent that each son became the owner of the third part of the land from which he received the rent.

Furthermore, rent is an incident of the reversion in leased premises. 32 Am.Jur. 348. If there is a transfer of the ownership of the leased land, unaccrued rent passes to the grantee of the reversion. The rent belongs to the owner of the soil. *Johnson v. Siedel*, 178 Iowa 244, 159 N.W. 677, 678. If there had been an intention to divide the ownership of the land, it would have been sufficient in sub-paragraphs 1, 2 and 3 merely to have said that certain of the parties, naming them, "shall be the owners" of a certain part of the land and the conveyance of the reversion in that part to them would have brought the unaccrued rent to them as an incident of the reversion. There would have been no necessity whatever for adding after the word "owners" the words "for the purpose of receiving the rent, etc." The very fact that such words were added is a clear indication, taken in connection with sub-paragraph 4, that it was the

intention to divide the rent only and not the ownership of the land. That was to remain in the matai.

■ We think, therefore, that Tiumalu Male, as the successor to Tiumalu Lailai, had the capacity to make a valid lease, particularly since the provision in the operative part of the contract clearly said, "The ownership of the lands remains in the Matai of the Tiumalu Family." There is no mistaking what that language means. We cannot ignore it.

As heretofore stated, Tiumalu Male leased the land (not the store building on it) to Ho Ching on November 1, 1938, and the lease came to plaintiff Haleck through assignment for value from the Ho Ching heirs after their father's death in 1953. The Tiumalu title was vacant from the time of Tiumalu Male's death in 1952 until the defendant got the title in 1956.

It seemed to us during the trial that there was some suggestion by the defendant that Tiumalu Male may have committed some sort of a fraud (just what it was was not made clear to us) on the heirs of Lailai who were receiving the rent on the September, 1925 lease when he executed the new lease to Ho Ching on November 1, 1938. It is difficult for the Court to believe there was any fraud when the evidence shows that the old lease made by Tiumalu Lailai for 15 years from September 1, 1925 provided for a rent of only $20.00 a month while the new lease by which the old lease was replaced provided for a rent of $30.00 a month, the Lailai heirs taking the increased rent without any objection on their part while Tiumalu Male and his heirs got none of it. That does not have the appearance of fraud.

■ It is further claimed that Tiumalu Male did not consult with the Lailai heirs before making the lease upping the rent 50% and that at least one of the Lailai male heirs cried about it. It was claimed also that there is a Samoan custom that the matai shall consult with his family mem-

bers before making a lease, and the defendant introduced evidence to that effect. Every judge on this bench knows judicially that sometimes the matai consults the family and sometimes he does not and that the custom is not universal by any means. That is a matter of common knowledge. Furthermore, courts do not shut their eyes to matters of common knowledge. They take judicial notice of such matters. 31 C.J.S. 510, 511.

But conceding that the custom did exist in 1938 and that Tiumalu Male did not consult with the family, the most that can be said is that since the Lailai heirs took the rent for twenty years with full knowledge of the facts (and family members would of necessity know it if they were not consulted), the lease cannot now be declared void by the Court. If the Lailai heirs did have an equity to a rescission of the lease, they slept on that right for 20 years. Twenty years of laches bars their remedy.

■ The defendant's counterclaim is equitable in nature. "Equity aids one who has been vigilant and will refuse relief to one who has been dilatory or wanting in diligence in prosecuting his cause of action. It is said that no rule is better settled than that relief will be denied a complainant who has slept on his rights." 19 Am.Jur. 333.

In this case the Lailai people have been asleep for 20 years with one eye with respect to any possible avoidance of the lease but during the same 20 years have been fully awake with the other eye with respect to taking the increased rental money from the tenant.

■ Conceding again that if the lease by Male to Ho Ching had a defect because of lack of consultation with the family before it was made, such defect was cured by ratification of the lease through acceptance of the rent pursuant to its terms for 20 years with full knowledge.

"A voidable lease may be affirmed or ratified by the party having the right to avoid it, and no particular act is

389

a necessary element of affirmance or ratification." 51 C.J.S. 839. And "Occupation of the premises by the lessee and payment of rent according to the terms of the lease usually are held to constitute ratification by the lessee of a defective lease, or one voidable for fraud or duress. . . . Acquiescence in the occupancy of the premises by the lessee, and acceptance of rent from him will, as a rule, amount to a ratification of a voidable lease by the lessor, as where the lease is affected by fraud or mistake." Id.

And again we think that the defendant Tiumalu Taimane, successor in title to Tiumalu Male, the original lessor, has not only ratified the lease but is estopped from avoiding the lease including the renewal clause, and this because the full amount of the rental over the 20 years has been accepted by the Lailai heirs who were to receive it pursuant to the contract for division of rents among the Tiumalu Family. "A lessor who has received the full consideration for the lease, and those claiming under him, may not question the right of the lessee to hold the premises." 51 C.J.S. 841.

The defendant Tiumalu Taimane testified that she did not repudiate the lease but took the rent out of respect for Male. She not only took rent directly from tenant Haleck but also prevailed upon him to liquidate two of her debts to the Bank of American Samoa by paying the rent to the bank, which he was certainly under no obligation to do. If the lease was defective as contended by her, such action on her part was certainly a ratification which cured any defect. And having with full knowledge accepted the benefits under the lease from its assignee in good faith for value, she cannot now repudiate the burdens. She cannot say that the lease was good as far as her taking the rent from Haleck directly or paying her debts with it to a third party was concerned and void so far as performance of her obli-

gations under it is concerned. She cannot have the benefits without the obligations; they go together.

■ Again if there was any defect in the lease on account of any alleged failure by Male to consult with the family before executing it on November 2, 1938, that defect was wiped out by the assignment of the lease to Haleck by the Ho Ching heirs for a valuable consideration, Haleck being an innocent purchaser without notice of any such defect. It is familiar law that where the equities are equal the legal title prevails. 19 Am.Jur. 337.

■ We believe the contention that the covenant of the lessor to renew the lease at the option of the lessee was without consideration is without merit. The covenants of the lessee including the covenant to pay the rent constituted the consideration for the covenants of the lessee, including the covenant to renew at the option of the lessee. Also "A covenant to renew a lease contained in the lease itself is based on a sufficient consideration and is valid, although unilateral in the sense that the lessee is under no obligation to renew, because such a covenant may well be considered as a material inducement to the execution of the lease." 51 C.J.S. 599.

■ The plaintiff exercised his option for renewal by demanding that the defendant enter into and execute a new lease in accordance with the covenant for renewal but the defendant refused performance.

We reach the conclusion that plaintiff Haleck is entitled to have defendant Tiumalu Taimane specifically perform the covenant in the lease to renew it for another 20 years.

■ The renewal lease for 20 years from the expiration of the old lease on February 3, 1959, will be a new lease. After the execution it may be presented to the Land Commission for its recommendation to the Governor, pursuant to the provisions of Section 1281 of the A. S. Code.

Section 1281 provides that "All instruments affecting the title to land which require the approval of the Governor before becoming effective shall be filed with the Secretary of the Land Commission for study and recommendations thereon by the Commission. The said Commission shall . . . make recommendations to the Governor respecting the approval or disapproval of instruments affecting the title, ownership or possession of land, so submitted for consideration and approval. It shall be the duty of the Commission to endeavor to prevent the monopolistic ownership of land and *improvident alienations of communal lands* (emphasis added) by those charged with the management and control thereof."

Section 1280 of the Code provides that "As used in this Chapter 'Alienation' shall mean the sale, gift, exchange, or any other method of disposal." A renewal lease of the land will dispose of an estate for 20 years in it. An estate for years is frequently treated as an interest in land. See *Fidelity Trust Co. v. Wayne County*, 244 Mich. 182, 59 ALR 698.

Section 1283 of the Code provides that "Native land may, with the approval of the Governor, be leased to any person for any term not exceeding thirty (30) years for any purpose, except for the working of minerals, and cutting of timber."

We think that Sections 1281 and 1283 constitute a proper exercise of the police power of the Government to protect the owners of communal lands from improvident dispositions of their property by lease or otherwise.

In the exercise of its police power, the Government may see to it that a lease provides for an adequate and reasonable rental under existing conditions or in effect prohibit the making of the lease through the intervention

of the Land Commission and the Governor, unless it provides for a sufficient rental so as not to make the transaction improvident with respect to the owner of the Samoan communal land. The Samoan people need protection against improvident transactions such as disposing of their property for less than it is worth.

 The provision in Section 10 of Article 1 of the U.S. Constitution to the effect that "No State shall . . . pass . . . any law impairing the obligation of contracts" is a limitation upon the power of a State, not a U.S. possession as is American Samoa.

In *Home Bldg. & Loan Assoc. v. Blaisdell* (1933), 290 U.S. 398, 88 ALR 1481, a Minnesota statute extended the period for redemption from a mortgage foreclosure. This was during the time of great economic distress in the United States in the early 1930's. The Supreme Court of the United States upheld the statute as a proper exercise of the police power of the State for the protection of the economic interests of the people despite the prohibition against the impairment of the obligation of contracts clause in Article 1, Section 10, and the due process and equal protection clauses in the 14th Amendment. Speaking with reference to the constitutional prohibition against the passage of laws by a state which impair the obligations of a contract, Mr. Justice Brewer in *Long Island Water Supply Co. v. Brooklyn*, 166 U.S. 685, 692, said: "But into all contracts, whether made between States and individuals, or between individuals only, there enter conditions which arise not out of the literal terms of the contract itself; they are superinduced by the pre-existing and higher authority of the laws of nature, of nations or of the community to which the parties belong; they are always presumed, and must be presumed, to be known and recognized by all, are binding upon all, and need never,

therefore, be carried into express stipulation, for this could add nothing to their force. Every contract is made in subordination to them, and must yield to their control, as conditions inherent and paramount, wherever the necessity for their execution shall occur." An examination of the decisions of the U.S. Supreme Court interpreting the prohibition against the impairment of the obligation of contracts will reveal that it is not absolute.

Mr. Justice Reed in *Veix v. Sixth Ward Building and Loan Association,* 310 U.S. 32, 38, said: "In *Home Building and Loan Association v. Blaisdell* (290 U.S. 398, 434) this Court considered the authority retained by the State over contracts 'to safeguard the vital interests of its people.' The rule that all contracts are made subject to this paramount authority was there reiterated. Such authority is not limited to health, morals and safety. It extends to economic needs as well. Utility rate contracts give way to this power, as do contractual arrangements between landlords and tenants."

 Section 1281 respecting the creation and duties of the Land Commission was enacted into law on June 24, 1947 (It was enacted as Amendment No. 8-1947) which was after the November 1, 1938 lease was executed by Tiumalu Male and Ho Ching. But it was in effect when Haleck took the assignment of the lease from the Ho Ching heirs in 1954 and 1955.

DECREE

Accordingly, it is ORDERED, AJDUDGED and DE-CREED that the defendant Tiumalu Taimane in her capacity as the Matai of the Tiumalu Family shall within 10 days execute and deliver to the plaintiff Max Haleck, Sr., a new lease pursuant to the renewal clause in the lease of November 1, 1938, from Tiumalu Male to Ho Ching. How-

394

ever, the renewal lease shall not contain a provision for its renewal at the option of the lessee.*

Costs in the sum of $25.00 are hereby assessed against Tiumalu Taimane, the same to be paid within 30 days.

---

* "A general covenant to renew or a covenant to renew with like terms, conditions, and covenants ordinarily does not import a renewal covenant in the renewal lease, for the reason that, if a general covenant for renewal authorizes the insertion of a similar covenant in the lease giving a renewal, the effect would be to create a perpetuity." 51 C.J.S. 606. There is nothing in the renewal clause in the lease to indicate an intention to create a perpetuity.