UNITED STATES of America,
Plaintiff-Appellee,

v.

434.00 ACRES OF LAND MORE OR LESS, IN the COUNTY OF CAMDEN, STATE OF GEORGIA; and Michael R. Nettles, et al., Defendants,

Edward Leroy Cornelly, Jr., Harry B. Mahon, Melodie H. Mahon, Lacy Mahon, and Nancy Mahon, Richard A. Altobellis, Defendants-Appellants.

No. 85–8776.

United States Court of Appeals,
Eleventh Circuit.

June 27, 1986.

David W. Foerster, Lacy Mahon, Jr., Jacksonville, Fla., for owner of parcel 33.

Edmund A. Booth, Jr., Asst. U.S. Atty., Augusta, Ga., Sarah P. Robinson, Dept. of Justice, Washington, D.C., for plaintiff appellee.

Before JOHNSON and ANDERSON, Circuit Judges, and GARZA *, Senior Circuit Judge.

* Honorable Reynaldo G. Garza, Senior U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

JOHNSON, Circuit Judge:

The United States government had earlier secured an easement over parcels of land owned by the appellants. Now the government seeks to take these properties in exchange for just compensation. Under our Constitution private property is, in all cases, held subject to the exigencies of the public good. "The constitutional guarantee of just compensation is not a limitation of the power to take, but only a condition of its exercise." *Long Island Water Supply Co. v. Brooklyn*, 166 U.S. 685, 689, 17 S.Ct. 718, 720, 41 L.Ed. 1165 (1897). The question posed by this case is whether compensation tendered was just compensation.

### I.

Parcel 33, owned by appellant Altobellis, is 57 acres of undeveloped land along the North River in Camden County, Georgia. Parcel 34, owned by appellants Cornelly and the Mahon family, is adjacent to parcel 33 and constitutes 89 undeveloped acres along the same river.

In 1955 the United States Army secured a large block of land near these parcels to be used for the Kings Bay Ammunition Loading Terminal. As part of the plans for this Terminal, the Army secured a restrictive "safety area" easement over portions of these two tracts of land. The easements limited building on or use of the easement area of the fees due to the risk of injury from possible explosions. This conveyance gave to the United States "an easement and right for the establishment, maintenance, operation and use of a safety area, in connection with the Kings Bay Ammunition Loading Terminal" over parcels 33 and 34. The Army also secured identical easements over two parcels directly across New Point Peter Road from parcels 33 and 34. The easement was freely assignable for any purpose to any party at the government's discretion.

In 1978 the Army transferred the Kings Bay Terminal and its accompanying servitudes to the United States Navy for use as a new Trident Submarine Base. The transfer reserved for the Army the right to maintain ammunition outload capability at Kings Bay in the event of war in Europe. In 1980 the Navy was relieved of this reservation; all Army interest in the land and the easements terminated. The new submarine base has set off a land boom in Camden County. The construction of the base necessitated use of the parcels for purposes beyond the scope of the easements—namely the manufacture and storage of torpedoes—and the parcels were condemned in 1983 according to the usual process. Also condemned were the parcels across the road; the government reached an agreement with those owners as to the amount of compensation.[1]

At issue is whether the easements over parcels 33 and 34 had been abandoned due to use of the land for a purpose different than that for which the easements were originally granted. Whether the easements were abandoned would affect the fair market value of the land now being taken and, hence, whether the amount of compensation awarded for the present taking was just.

By the trial judge's own motion a Land Commission was appointed under Fed.R. Civ.P. 71A(h) to take evidence and to fix a fair value for the properties. Upon motion of Altobellis, the court was requested to consider whether the easements on the parcels had been abandoned. The trial court held an evidentiary hearing and determined that the current use of the easement and the original use for which it was granted are the same: "for use in the event of outbreak of war in Europe." The court determined that the easement had not been abandoned and that the owners had not met the high burden required under Georgia law to show abandonment of an express easement.

---

**1.** The Navy had declared the easements over these two properties to be surplus. It ultimately terminated these easements according to the statutory mechanism for disposal of government property.

To conserve resources in the event of reversal on appeal, however, the commission was ordered to make a valuation of the property both if burdened and unburdened by the easement. The commission heard testimony from a government expert and from three experts hired by the appellants. Inevitably they came to different conclusions as to the fair value of the land. The government's expert valued parcel 33, burdened with an easement, at $57,000; Altobellis' two experts valued it at $176,000 and $157,000. The land commission concluded that the fair value of parcel 33 was $57,000 if burdened and $399,000 if unencumbered. The government's expert valued parcel 34 with easement at $71,200, while the Cornelly/Mahon expert valued it at $311,500. The commission found an encumbered value of $89,000 and an unencumbered value of $335,000.

The owners of each parcel filed objections only as to the encumbered value determination. Altobellis claimed that the commission failed to consider the sale value of similar property, with the same easement, across New Point Peter Road, that it failed to consider recent after-the-fact sales, and that it failed to use the proper valuation method for a portion of the land to be used for fill dirt purposes. As to parcel 34, the owners objected to the commission's failure to consider the sales across the road on similar property, and failure to consider an after-the-fact sale.

The trial court overruled the objections and adopted the commission's report as not clearly erroneous, entering final judgment on September 11, 1985. The owners of both tracts appeal.

## II.

This case presents two issues: A) whether the trial court erred in finding that the easements had not been abandoned; and B) whether the trial court erred in adopting the land valuation report of the commission.

## A.

Whether the easement has been abandoned or has expired is a factual question entrusted to the sound discretion of the trial court. It may be reversed on appeal only if clearly erroneous. Fed.R.Civ.P. 52(a).

■ The gist of the appellants' argument is that the easements here were granted for a specific purpose—for use by the Army in connection with its ammunition depot. That purpose, they claim, never came into being because the government never developed the depot. The government disputes this,[2] but in any event appellants also argue that the easements are no longer being used for the original purpose and hence are no longer valid encumbrances on the properties. Thus just compensation due is the fair market value set for the fee unburdened. Appellants attempt to draw a distinction between the trial court's characterization of the issue as whether the easement has been abandoned *generally* (which requires a showing of intent) and their characterization that there has been an abandonment of *original purpose*. When the purpose for which the easement was granted ceased to exist, appellants argue, the easement expired, rather than was abandoned.

The appellants premise their argument on a heavy citation to cases decided by various state courts, and by reference to hornbooks that collect cases, to show that the common law of property prohibits using a restrictive easement for any purpose other than that for which it was explicitly granted. They also show the existence of a common law rule to the effect that when an easement is created to accomplish a specific purpose, and that purpose ceases

2. While it makes no matter to the disposition of this case, the record reflects that the land was taken for use as an ammunition depot in the event of war in Europe. Since there has been no war in Europe for quite some time, the land was apparently never used as a place of indefinite storage or outloading. However the government did, on at least one occasion and possibly others, store ammunition there in railroad cars for relatively brief periods.

to exist or to be achievable, the servitude terminates by expiration.

■ The demonstration of these common law rules is not so much wrong as off the mark. What the appellants have failed to understand is that the cases they cite involve easements granted in the context of private business dealings or where the only governmental interest was sub-national.[3]

The holder of the servitude here is the federal government. Congress has provided by statute the only way by which the United States may be divested of a property interest such as an easement: it must be declared to be surplus property available for disposal through sale, lease, transfer or other express act and attended by the usual transfer of title documents.[4]

3. For example, the appellants place great stock in *Canal Authority of Florida v. Mainer,* 440 So.2d 1304, 1306 (Fla.Dist.Ct.App.1983) *aff'd on other grounds,* 467 So.2d 989 (Fla.1985), in which the court ruled that easements granted for the construction of the cross-Florida canal had been extinguished because Congress had stopped appropriating money for the project years before. This case is inapposite for two reasons. First, by the terms of that easement it was granted in perpetuity "or until such time as said property should no longer be required for the purposes of The Cross Florida Barge Canal project...." 440 So.2d at 1306. No such express reservation is extant in the instant case. But second, and more importantly, the taking was by the State of Florida. The federal government was providing funding for the project, but it did not actually own or hold any interest in the fee. Therefore the disposition of the servitudes could be effected under Florida common law, not under the relevant federal statute.

Reliance on *City of Atlanta v. Fulton County,* 210 Ga. 784, 82 S.E.2d 850 (1954) is misplaced because that controversy was simply between the state and a city; there was no federal interest implicated and thus federal law did not apply. Appellants also cite *United States v. Certain Lands in the City of Newark,* 439 F.2d 670 (3d Cir.1971). There the federal government was a party and the court did hold that an easement reverts back to the original owner after the original purpose of the taking can no longer be effected. But that case is inapposite for two reasons. First, even if we were to hold that abandonment or termination of an easement is a question of state law, *City of Newark* was decided under New Jersey, rather than Georgia, law; it is not controlling in any event. But more importantly, *City of Newark* relied upon state law only to settle a subsidiary question: whether the City of Newark or the original owner of the easement was the owner to whom the federal government had to pay for its taking. The question was not whether a federal property interest could expire without express action by Congress, nor was the federal interest actually at issue in *City of Newark* resolved by reference to state law. Finally, appellants commend to us *Florida Blue Ridge Corp. v. Tennessee Electric Power Co.,* 106 F.2d 913 (5th Cir.1939). This case is irrelevant because it involves two

corporations in the private context. There was no federal interest at stake.

4. The disposition of surplus government property is generally governed by 40 U.S.C.A. §§ 471, 484(c) (1985) ("Any executive agency designated or authorized by the Administrator [of the General Services Administration] to dispose of surplus property may do so by sale, exchange, lease, permit, or transfer, for cash, credit, or other property, with or without warranty, and upon such other terms and conditions as the Administrator deems proper, and it may execute such documents for the transfer of title or other interest in property and take such other action as it deems necessary or proper to dispose of such property under the provisions of this subchapter."). "Property" for purposes of the statute "means any interest in property ..." and hence would include easements and servitudes. 40 U.S.C.A. at § 472(d). "Surplus property" means that property "not required for the needs and the discharge of the responsibilities of all Federal agencies...." *Id.* at § 472(g).

This statute confers paramount authority "and shall not be subject to the provisions of any law inconsistent herewith," other than certain inapplicable exceptions. *Id.* at § 474. Section 304a of Title 40 is not to the contrary. That provision states that "[n]otwithstanding any other provisions of law, whenever any real property ... *exclusive of military or naval reservations,*" is determined to be surplus property, it will be disposed of by the Administrator of the General Services Administration ["GSA"] according to statute. (Emphasis supplied). We interpret 40 U.S.C.A. § 304a as merely incorporating the congressional reporting requirements of 10 U.S.C.A. § 2662. The latter provision bars the Secretary of Defense from issuing a "report of excess real property owned by the United States to a disposal agency, if the estimated value is more than $100,000" without first notifying Congress. *Id.* at 2662(a)(5). The statute also provides that the Secretary may so dispose of property of lesser value but must report such disposition in an annual report to Congress. *Id.* at 2662(b). We determine that Congress did not seek to prescribe a different mechanism for disposing of surplus or excess real property interests held by the Defense Department than for those held by the other departments. Rather it imposed a "report and wait" provision in conjunction with the usual disposal responsibility

Likewise, the Supreme Court has held that the federal government "is not to be deprived of [its property] interests by the ordinary court rules designed particularly for private disputes over individually owned pieces of property...." *United States v. California,* 332 U.S. 19, 40, 67 S.Ct. 1658, 1669, 91 L.Ed. 1889 (1947); *see also Higginson v. United States,* 384 F.2d 504, 507 (6th Cir.1967) (*per curiam*) ("A subsequent abandonment of the original purpose for which land was acquired [by the federal government] does not affect the validity of the condemnation.... Also, title to property which is vested in the United States government cannot be returned to the original land owners without Congressional authorization."), *cert. denied,* 390 U.S. 947, 88 S.Ct. 1034, 19 L.Ed.2d 1137 (1968). The statute and case law simply lift this matter out of the realm of the common law and render the cases appellants cite irrelevant.[5]

The argument fails for a second reason. We assume, *arguendo,* that the government is bound by the common law of property and that an easement granted for a specific purpose expires when that purpose can no longer be achieved. While the easement here was granted for the purpose of a safety area around an ammunition depot, that statement of purpose was qualified by language that gave the government a free and absolute right to assign that easement in perpetuity "to any individual, partnership, corporation or political body, for either commercial or noncommercial purposes...." R. 1–70, Exh. A & B. A more open-ended grant would be difficult to pen. If the permissible purposes include any commercial or noncommercial effort, then it is difficult to argue that use as a submarine base as opposed to an ammunition depot is outside the scope of the grant. The appellants argue that the government retains free ability to assign only for use in connection with the Kings Bay Loading Ammunition Terminal. This is flatly wrong. The provision for reassignment for commercial purposes makes this clear. This reassignment is within the broad scope of permissible use of the easement and thus it has not expired due to failure to use or inability to be used for the intended purpose. By either measure, the appellants have failed to state a basis for reversing the result below.

## B.

The appellants do not challenge the commission's valuation of the land unencumbered, but do complain that the commission failed to give proper consideration to several facts that they argue should have led it to conclude that a higher price for the encumbered land was appropriate.

entrusted to the GSA. Read together, these two sections provide that the disposition of surplus military property is governed by the usual provisions of Title 40, so long as the reporting requirements of Title 10 are met.

Our conclusion is reinforced by Congress' apparent failure to make express provision for any other method of disposal of surplus real property held by the Department of Defense. Section 2662(a)(5) entrusts disposition of the military's surplus real property to the GSA, just as does Title 40 for the other departments. On the other hand, Congress has provided express rules for disposition of non-surplus real property. 10 U.S.C.A. § 2667a. Our conclusion is also buttressed by the fact that this reading permits reconciling the requirements of Title 40 with those of Title 10 in a way that is not inconsistent with the general purposes of either Title.

5. It is, perhaps, understandable that the appellants structure their argument around the re-

quirements of state law, because the trial court's judgment below found that the government had not abandoned the easement—under Georgia law. This was the right result, by the wrong reason. The trial court ignored the interdiction of the common law by statute and federal precedent. *See United States v. 93.970 Acres of Land,* 360 U.S. 328, 332–33, 79 S.Ct. 1193, 1195–96, 3 L.Ed.2d 1275 (1959) (federal law governs federal property interests unless Congress by enactment makes state law applicable). Nonetheless, we will affirm the decision of the trial court if it reaches the correct result, even if that court's legal reasoning is flawed. *Collins v. Seaboard Coastline R. Co.,* 681 F.2d 1333, 1335 (11th Cir. 1982). We do so here.

The appellants' argument that the trial court was in clear error in finding that the easements were not abandoned under Georgia law is accordingly off the mark. The federal government is not subject to these common law property rules.

The appointment of a land valuation commission in an eminent domain case is governed by Fed.R.Civ.P. 71A. Such commissions exercise the same general powers as do special masters, Rule 71A(h); trial court consideration of the commission's report is governed by the clearly erroneous standard of review set forth for special masters at Rule 53(e)(2). Use of the commission, rather than a jury, means that the *trial court* will impose a "somewhat stricter" review over the report than it would with a general jury verdict. *United States v. 320.0 Acres of Land,* 605 F.2d 762, 809–10 n. 101 (5th Cir.1979). This is because the commission may not simply offer conclusory findings; it must offer evidence to illustrate the reasoning by which it reached its conclusions. *United States v. Merz,* 376 U.S. 192, 198, 84 S.Ct. 639, 643, 11 L.Ed.2d 629 (1964). *Appellate* review of the trial court's acceptance or rejection of the commission's findings, however, is governed by the abuse of discretion standard because this represents a factual determination. *St. Genevieve Gas Co. v. TVA,* 747 F.2d 1411, 1413 n. 3 (11th Cir. 1984). Therefore, we review only the trial court's conclusion that the commission was not clearly erroneous, not the commission's fact finding directly. *O'Brien v. United States,* 392 F.2d 949, 952 (5th Cir.1968).

The trial court instructed the commission to consider, *inter alia,* any "comparable sale [of property with similar easement] in determining the value of the property in question." Appellants first point to the sale, three months prior to the valuation here at issue, of the "Sauls lot" directly across New Point Peter Road from their lots. The Sauls lot was encumbered by the same easement. They also point to the "Nettles lot"—the sale of the land that is currently held by Altobellis as parcel 33— for $100,000 two years prior to the valuation here at issue. Altobellis claims that his expert Yeargin used these sales in valuing the property, and that his expert Seckinger considered the sale prices, though Seckinger did not include them in his calculus. Cornelly, *et al.,* claim that their expert Lee also relied on the sales in reaching his valuation.

The commission disregarded this information, in part, because it found that none of the three experts relied upon the prior sales in reaching his valuation. It found that the appellants' experts either failed to mention the sale of the lot during their testimony or failed to explain the significance of the sale. The commission also found the Sauls sale uninstructive because at the time of that sale Sauls knew of the probability that the easement over his lot was going to be released, whereas at the time valuation here the appellants had no more than a ray of hope that the government might release the easements on parcels 33 and 34. The Nettles sale was distinguishable because it was sold by a widow, Mrs. Cobb, whose willingness to sell was variously described by the experts as very anxious and very reluctant, in either event suggesting that non-market factors may have skewed the price she received.

This is not clearly erroneous. The record reveals that while expert Yeargin did mention the Sauls sale, he failed to explain the significance of that sale except to assert, *ipse dixit,* that the two parcels were similar. On the other hand, he gave extensive testimony regarding the valuation inferences he could and did draw from a number of other land sales in the general vicinity of parcel 33. Mr. Yeargin failed to mention the Nettles sale.

Expert Seckinger relied on the Sauls sale, but only in determining the unburdened valuation. Mr. Seckinger admitted that his discussions with Mr. Sauls concerning property value came after a statement by an official of the General Services Administration to Mr. Sauls "about releasing that portion of the easement" that burdened the Sauls property. To that extent, even if Mr. Seckinger relied upon the Sauls sale, that property was not sold under conditions comparable to that for parcel 33, as the commission correctly found. Mr. Seckinger mentioned the Nettles sale, but admitted that Mrs. Cobb, the widow, "was really trying to sell it [the property] hard."

Mr. Seckinger did not rely on the Nettles sale in his calculus. From that we conclude that the trial court was not clearly erroneous in accepting the commission's finding that the Nettles sale was not relevant to the valuation question.

Expert Lee testified that he relied upon the Sauls sale, but stated clearly that this was only as to the unburdened price, and as to the burdened price if a purchaser knew that the easement could be removed. He did not cite this sale as instructive as to the burdened price. He likewise mentioned the Nettles lot, but as we noted above, the trial court did not err in accepting the commission's determination that the Nettles lot sale was irrelevant. The controverted evidence received by the fact finder below required credibility determinations that are without our province. We find that, as to the relevance of the Sauls and Nettles sale, the trial court was not clearly erroneous in accepting the factual determinations of the land commission.

Second, appellants note that, after the valuation here contested, the government released the parcels south of New Point Peter Road from the restrictive easement. Appellants argue that this demonstrates that at the time of the condemnation of parcels 33 and 34 north of the road it was reasonably probable for a hypothetical purchaser of either parcel to assume that the easement would be released. Hence, they argue, it is reasonable to assume that the price paid for the lot across the road is comparable to the value of parcels 33 and 34. Altobellis again argues that Mr. Yeargin relied upon and Mr. Seckinger considered this after-the-fact easement release and hence it was error for the commission to disregard it.

Government documents make clear that there was no possibility that parcels 33 and 34 would be released from servitude. Specifically, the record reflects that one year prior to the taking at issue an official of the Navy informed a Member of Congress that "it is essential that the restrictive easement be retained at this time." On the other hand, expert Lee admitted that in making his valuation, reflecting the expectation that the easements would be released, he had not even inquired of the Navy as to the possibility of release. In any event, at the time of the valuation there was *at best* an expectancy that the easement *might* be released. At the time of the sale of the lots across New Point Peter Road, however, the fact that the easements were going to be released was a known fact in the community. There was no error here.

Finally, Altobellis argues that the commission improperly declined to use the "cubic yard formula" in order to determine the valuation of that portion of his lot best usable for fill dirt purposes. The court's instruction told the commission that it could resort to such a method only if it found that the cubic yard formula was an accepted method of valuation and "that a market existed of that a market would exist in the reasonably near future after the date of valuation" for fill dirt.

The commission found that there was no evidence that multiplying the number of cubic yards of fill dirt on the relevant portion of the property times the price per cubic yard was an accepted valuation method. The Altobellis witnesses discussed how such valuation would be calculated, but neither demonstrated on the record that this was a usual instrument of valuation in comparable situations. Regardless of whether this was a reasonable calculus for the purpose advanced, there was no evidence of a fill dirt market within the foreseeable future at the time of the taking. The record discloses that Mr. Yeargin failed to conduct a study of the demand for and supply of fill dirt in Camden County at the relevant time. Likewise, Mr. Seckinger testified that he had no idea, on a cubic yard basis, what was the current supply of fill dirt in the county. Under the circumstances, the commission had little choice but to do what it evidently did: to determine the value, as a whole, of that portion of the fee usable for fill dirt purposes, rather than to attempt a valuation per cubic yard of earth lying within that fee. It

was not clear error for the trial court to accept the commission's determination.

### III.

Upon this record we find no evidence of error that will support a reversal. The court below correctly concluded that the parcels of land here at issue were, at the time of the taking, burdened. However, that court erred in reaching that conclusion guided by the principles of Georgia law. As we explained, the federal government is not amenable to suit under the common law of property regarding its holdings. The government's interest in land may only be terminated according to statute; by the relevant enactments there was no abandonment. Thus on the abandonment question the trial court is due to be affirmed in its result for the reasons stated herein.

Likewise, from the record it is clear that none of appellants' allegations of error as to the valuations of the burdened fees has merit. The trial court did not err in accepting the factual findings of the land commission for those findings were in all respects thorough and careful. Accordingly, the judgment below is due to be AFFIRMED.