BALTIMORE TEACHERS UNION, AMERICAN FEDERATION OF TEACHERS LOCAL 340, AFL–CIO; the City Union of Baltimore, American Federation of Teachers, Local 800, AFL–CIO, Plaintiffs–Appellees,

v.

MAYOR AND CITY COUNCIL OF BALTIMORE; Kurt L. Schmoke, Individually and in his capacity as Mayor and Member of the Board of Estimates of Baltimore City; Mary Pat Clarke, Individually and in her capacity as President of the Baltimore City Council and Member of the Board of Estimates of Baltimore City; Jacqueline F. McClean, Individually and in her capacity as Comptroller and Member of the Board of Estimates of Baltimore City; Neal Janey, In his capacity as Member of the Board of Estimates of Baltimore City; George F. Balog, Individually and in his capacity as Member of the Board of Estimates of Baltimore City; Board of Estimates of Baltimore City, Defendants–Appellants.

In Re STATE OF MARYLAND, Appellant,

v.

BALTIMORE TEACHERS UNION, AMERICAN FEDERATION OF TEACHERS LOCAL 340, AFL–CIO; the City Union of Baltimore, American Federation of Teachers, Local 800, AFL–CIO, Plaintiffs–Appellees,

v.

MAYOR AND CITY COUNCIL OF BALTIMORE; Kurt L. Schmoke, Individually and in his capacity as Mayor and Member of the Board of Estimates of Baltimore City; Mary Pat Clarke, Individually and in her capacity as President of the Baltimore City Council and Member of the Board of Estimates of Baltimore City; Jacqueline F. McClean, Individually and in her capacity as Comptroller and Member of the Board of Estimates of Baltimore City; Neal Janey,

In his capacity as Member of the Board of Estimates of Baltimore City; George F. Balog, Individually and in his capacity as Member of the Board of Estimates of Baltimore City; Board of Estimates of Baltimore City, Defendants.

BALTIMORE CITY LODGE NUMBER 3 FRATERNAL ORDER OF POLICE, Plaintiff–Appellee,

v.

MAYOR AND CITY COUNCIL OF BALTIMORE, Defendant–Appellant.

Nos. 92–2234, 92–2237 and 92–2238.

United States Court of Appeals, Fourth Circuit.

Argued March 3, 1993.

Decided Sept. 2, 1993.

Order and Dissenting Opinion on Denial of Rehearing and Rehearing En Banc Oct. 12, 1993.

Ambrose T. Hartman, Deputy City Sol., Dept. of Law; and Marlene Trestman, Asst. Atty. Gen., Baltimore, MD, argued (William R. Phelan, Jr., Sr. Sol., James S. Ruckle, Jr.,

Asst. Sol., Dept. of Law, and J. Joseph Curran, Jr., Atty. Gen., on brief), for appellants.

Joel Allen Smith, Kahn, Smith & Collins, P.A. and Michael Lawrence Marshall, Schlachman, Belsky & Weiner, P.A., Baltimore, MD, argued (Christyne L. Neff, Kahn, Smith & Collins, P.A., Herbert R. Weiner, Schlachman, Belsky & Weiner, P.A., on brief), for appellees.

Before WIDENER and LUTTIG, Circuit Judges, and VOORHEES, Chief United States District Judge for the Western District of North Carolina, sitting by designation.

## OPINION

LUTTIG, Circuit Judge:

In response to budgetary shortfalls, Baltimore City implemented a plan under which it ultimately reduced the annual salaries of its employees by approximately 1%, through deductions from five of their semi-monthly paychecks. Its teachers and police, through their certified collective bargaining units, brought suit alleging that the salary reductions constituted an impermissible impairment of their contracts with the City. The district court entered judgment in their favor, and we now reverse.

### I.

The facts essential to the resolution of this case are simple and not in dispute. Baltimore has what is commonly known as an "executive budget system," the chief executor of which is the City's Board of Estimates. *See generally City of Baltimore v. American Fed'n of State, County & Mun. Employees,* 281 Md. 463, 379 A.2d 1031, 1034–36 (1977). Pursuant to the Municipal Employee Relations Ordinance ("MERO"), the police negotiate memoranda of understanding embodying the terms of their employment with the City, which are approved by the Board of Estimates and collected with other budgetary obligations in an Ordinance of Estimates. The Ordinance of Estimates is then enacted into law by the City Council. The process for the City's teachers, though not pursuant to MERO, is apparently similar. The Board

of School Commissioners negotiates the terms of employment, which are then approved by the Board of Estimates, included in the Ordinance of Estimates, and enacted into law by the City Council. It is undisputed that these procedures were followed for Fiscal Year 1992, the period relevant to this litigation.

As of October 1991, Baltimore had lost a total of approximately $24.2 million in state aid, $4.78 million of which was cut pursuant to special authority granted the Governor by the General Assembly meeting in special session. Baltimore responded to this round of cuts with a variety of measures, such as layoffs, elimination of positions, and early retirements. Having failed to reverse the tide of the State's financial fortunes, the Governor announced in December 1991 a new round of proposed cuts in state aid to Baltimore, equal to approximately $13.3 million, and in response Baltimore implemented its so-called furlough plan. Under the plan, full-time city employees, except for firefighters, who enjoy certain privileges, lost the annual equivalent of 2.5 days of pay, or .95% of their gross annual salary, and Baltimore saved approximately $2 million, which it does not intend to refund. These salary reductions were less than those originally contemplated under the plan, because it was discontinued midstream after the General Assembly approved only $4.68 million of the cuts proposed by the Governor for Baltimore City.

Seeking restitution, the teachers and police brought suit, charging that their salary reductions violated the Contract Clause, U.S. Const. art. I, § 10, cl. 1 ("No State shall ... pass any ... Law impairing the Obligation of Contracts...."). The district court ruled in their favor, 801 F.Supp. 1506, and this appeal followed.

### II.

■ Though the Contract Clause is phrased in absolute terms, the Supreme Court does not interpret the Clause absolutely to prohibit the impairment of either government or private contracts. *See United States Trust Co. v. New Jersey,* 431 U.S. 1, 21, 97 S.Ct. 1505, 1517, 52 L.Ed.2d 92 (1977) ("Although the Contract Clause appears lit-

erally to proscribe 'any' impairment, this Court observed in *Blaisdell* that 'the prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula.'" (quoting *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 428, 54 S.Ct. 231, 236, 78 L.Ed. 413 (1934))).[1] Rather, it has formulated essentially a three-part analysis for harmonizing the command of the Clause with the "necessarily reserved" sovereign power of the states to provide for the welfare of their citizens. *Id.*[2]

As a threshold matter, it must be determined whether there has been impairment of a contract. *See, e.g., id.* 431 U.S. at 17, 97 S.Ct. at 1515 ("[A]s a preliminary matter, appellant's claim requires a determination that the [law] has the effect of impairing a contractual obligation."). Second, it must be determined "whether the state law has, in fact, operated as a *substantial* impairment of a contractual relationship." *Spannaus*, 438 U.S. at 244, 98 S.Ct. at 2722 (emphasis added); *see also Bannum, Inc. v. Town of Ashland*, 922 F.2d 197, 202 (4th Cir.1990) (legislation must constitute "a severe impairment of the [contractual] right"). Finally, assuming there has been a substantial impairment of contract, it must be determined whether that impairment is nonetheless permissible as a legitimate exercise of the state's sovereign powers, an inquiry that differs subtly depending upon whether the contract impaired is a private or, as here, a public one. Analyzing Baltimore's action within this framework, we agree with the district court that the City substantially impaired an extant contract with its teachers and police. We conclude, however, affording the requisite degree of deference to the City's legislature, that the impairment was in exercise of the City's legitimate powers and thus permissible under the Contract Clause.

### A.

#### 1.

We have little trouble concluding, as did the district court, *see* J.A. at 344–45, that Baltimore intended to and did enter into contractual relationships with its teachers and police, at least upon enactment into law of the Ordinance of Estimates. *Cf. United States Trust*, 431 U.S. at 17 n. 14, 97 S.Ct. at 1516 n. 14 ("In general, a statute is itself treated as a contract when the language and circumstances evince a legislative intent to create private rights of a contractual nature enforceable against the State."); *American Fed'n*, 379 A.2d at 1035. Upon enactment of the Ordinance, the City Council formally ratified the essential agreement between the City and its employees embodied in the memoranda of understanding and authorized funding for the City's obligations under those memoranda.

There was, we believe, also an impairment of those contracts. The teachers and police indisputably received less in salary than they were entitled to receive under the terms of their contracts. Only if the employees' salaries were subject to unilateral adjustment by the City under the terms of the contract could it possibly be concluded otherwise. In this regard, the City argues that any contract that existed was expressly subject to the Baltimore City Charter which, it con-

---

**1.** *See also Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 240, 98 S.Ct. 2716, 2720, 57 L.Ed.2d 727 (1978) ("The language of the Contract Clause appears unambiguously absolute.... The Clause is not, however, the Draconian provision that its words might seem to imply.").

Justice Black, in dissent in *City of El Paso v. Simmons*, 379 U.S. 497, 517, 85 S.Ct. 577, 588, 13 L.Ed.2d 446 (1965), characterized the jurisprudence that resulted from the Court's refusal to adhere to the language of the Clause as a "balancing away [of] the plain guarantee of" the Contract Clause, a characterization that was disputed by the Court in *United States Trust*, 431 U.S. at 29, 97 S.Ct. at 1521. *But see Energy*

*Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 410, 103 S.Ct. 697, 703, 74 L.Ed.2d 569 (1983) (In *Blaisdell*, "[t]he Court balanced the language of the Contract Clause against the State's interest in exercising its police power, and concluded that the statute was justified.").

**2.** The Court has described the police power as "an exercise of the sovereign right of the Government to protect the lives, health, morals, comfort and general welfare of the people, [which] is paramount to any rights under contracts between individuals." *Spannaus*, 438 U.S. at 241, 98 S.Ct. at 2721.

tends, permitted the reductions. Appellants' Br. at 17. We reject this contention.

Given the value ascribed to contracts in our society, and the Constitution's explicit proscription on the state's impairment of contracts, we would not hold, absent the clearest evidence, that the City intended to confer upon the Board of Estimates even the power unilaterally to modify the City's contracts. We do not read the City Charter as clearly evidencing such an intent. As the City notes, the memoranda of understanding were made explicitly subject to the provisions of the City Charter, see Baltimore, Md., Code art. I, §§ 119, 123, and, in any event, contracts generally are understood to incorporate existing law, such as the Charter, see *Blaisdell,* 290 U.S. at 435–36, 54 S.Ct. at 239. But section 2(g) of the Charter,[3] which the City argues most clearly authorizes the modification of contracts, only authorizes the Board of Estimates to effect "reductions ... in appropriations." This power does not nec-

essarily subsume the power to modify contracts,[4] and therefore does not clearly evidence an intention to authorize such modifications.[5]

### 2.

Whether the impairment of the employees' contracts was substantial is a slightly more difficult question, but one that we believe also must be answered in the affirmative. A respect for the vital role of contract generally informs the "substantiality" inquiry:

> The severity of an impairment of contractual obligations can be measured by the factors that reflect the high value the Framers placed on the protection of private contracts. Contracts enable individuals to order their personal and business affairs according to their particular needs and interests. Once arranged, those rights and obligations are binding under the law,

---

3. Baltimore, Md., Charter art. VI, § 2(g) provides that "[i]n case of any such deficiency [arising from a failure to realize sufficient income from all sources to meet the amounts provided in the Ordinance of Estimates] the Board of Estimates shall effect reductions ... in appropriations...."

4. It is unclear whether the events here even triggered applicability of section 2(g). That section authorizes *reductions in appropriations only* in the event of a "deficiency." At the time the furlough plan was adopted in January, however, the Maryland General Assembly had yet to authorize the Governor to effect the anticipated cuts in funding to the City, an event which did not occur for several months—and even then in amounts different from those originally contemplated.

   Even assuming that section 2(g) was applicable, it is far from clear that the furlough plan constituted a reduction in "appropriations" as contemplated in section 2(g). The record reflects that the Board of Estimates implemented the furlough plan merely by approving the recommendations made to it in a January 15, 1992, letter from Edward Gallagher, Chief of the Bureau of the Budget and Management Research Division of the Baltimore Department of Finance. See J.A. at 35; see also Appellants' Br. at 13 ("The pay reduction plan was put into effect immediately after the Board of Estimates approved it on January 16, 1992."). That letter makes no mention of section 2(g) or, for example, of a reduction in appropriations to any particular city program. Indeed, it makes no mention of any reduction in "appropriations" at all. Rather, the letter refers only to an "across-the-

board reduction in payroll costs" which would result in "financial savings." *Id.* Moreover, terminating the furlough plan after only one-half of the approved payroll reduction had been realized required no further action by the Board of Estimates, at least in the opinion of the Mayor, who unilaterally directed the Department of Finance to cease the payroll deductions. *Id.* at 191. These somewhat truncated procedures, especially given that the City proffered no evidence of an *actual appropriation reduction and does not* refer to any such evidence in this court, belie the suggestion that an appropriation reduction ever occurred.

5. The concurrence would hold that the City, through the Neall Amendment, see Budget Reconciliation Act for Fiscal Year 1992 § 9(a), was authorized unilaterally to contravene the terms of its contracts with the police unions and thus that there was no impairment of their contracts. That amendment provides in relevant part that the City "may take any action necessary, including any action to reduce a previously approved appropriation, to prudently manage its fiscal affairs and to meet its obligations under [the Budget Reconciliation Act for Fiscal Year 1992]." If the Neall Amendment were read to authorize any contravention of contractual terms, as the concurrence would read it, it is doubtful that there ever existed (or ever could exist) a contract between the City and its employees, because there would have been a failure of mutual obligation. More importantly, even assuming such a failure were not fatal to contract formation, the Amendment, so read, would almost certainly violate the Contract Clause itself.

and the parties are entitled to rely on them.

*Spannaus*, 438 U.S. at 245, 98 S.Ct. at 2723. The Supreme Court, however, has provided little specific guidance as to what constitutes a "substantial" contract impairment. It is clear that not all impairments are substantial for Contract Clause purposes. "Technical" impairments, for example, do not necessarily rise to the level of constitutional violations. *See id.* ("Minimal alteration of contractual obligations may end the inquiry at its first stage."); *see also United States Trust*, 431 U.S. at 21, 97 S.Ct. at 1517 ("A finding that there has been a technical impairment is merely a preliminary step in resolving the more difficult question whether that impairment is permitted under the Constitution."). By the same token, there is plainly no requirement of total repudiation. *See Energy Reserves*, 459 U.S. at 411, 103 S.Ct. at 704 ("Total destruction of contractual expectations is not necessary for a finding of substantial impairment."); *United States Trust*, 431 U.S. at 26, 97 S.Ct. at 1519. The ground between these spectral ends, though, has yet to be charted with any precision.

While the Court has not refined the analysis for assessing the substantiality of an impairment, it has appeared to assume that an impairment is substantial at least where the right abridged was one that induced the parties to contract in the first place, *see El Paso*, 379 U.S. at 514, 85 S.Ct. at 587 ("We do not believe that it can seriously be contended that the buyer was substantially induced to enter into these contracts on the basis of a defeasible right to reinstatement...."); *Spannaus*, 438 U.S. at 243 n. 14, 98 S.Ct. at 2722 n. 14 (noting that *El Paso* Court concluded that the " 'measure taken ... was a mild one indeed' " because it did not affect term that induced contract (quoting 379 U.S. at 616, 85 S.Ct. at 525)); *see also id.* at 245 & n. 17, 98 S.Ct. at 2723 & n. 17 (citing to n. 14 discussion of *El Paso*'s inducement inquiry in support of statement that "minimal alteration" of contract obligations may not violate Clause), or where the impaired right was one on which there had been reasonable and especial reliance,[6] *see, e.g., Spannaus*, 438 U.S. at 246, 98 S.Ct. at 2723 (noting that state law changed obligations "in an area where the element of reliance was vital"); *id.* ("[The company] relied heavily, and reasonably, on this legitimate contractual expectation...."); *id.* ("Thus, a basic term of the pension contract—one on which the company had relied for 10 years—was substantially modified.").[7]

The Court, thus, has refused to invalidate a state's statute of repose, on the ground that the reinstatement right affected by the statute "was not the central undertaking of the seller nor the primary consideration for the buyer's undertaking." *See El Paso*, 379 U.S. at 514, 85 S.Ct. at 586. Similarly, because the affected party could not have relied upon receipt of such benefits, the Court has "regarded the elimination of unforeseen windfall benefits as a reasonable basis for sustaining

6. The Court has long regarded the "contemporaneous state law pertaining to [contract] interpretation and enforcement" as effectively incorporated into contracts, even if the parties have not expressly incorporated it. *See, e.g., United States Trust*, 431 U.S. at 19 n. 17, 97 S.Ct. at 1516 n. 17.

7. On occasions, the Court has inquired whether the impairment altered the parties' "legitimate expectations." *United States Trust*, 431 U.S. at 20 n. 17, 97 S.Ct. at 1516 n. 17, *see also Spannaus*, 438 U.S. at 247, 98 S.Ct. at 2723 (noting absence of evidence that the disruption of "contractual expectations" was necessary). It is unclear whether the Court regards this inquiry as different from its inquiry into whether the parties actually relied upon the existence of the contractual right impaired. *Spannaus'* primary emphasis on reliance suggests that the Court's general reference to contract expectations was merely a shorthand for reliance. To the extent that actual reliance and expectations are not intended to be the same, however, the inquiry into expectations is reminiscent of that undertaken "[d]uring the early years when the Contract Clause was regarded as an absolute bar to any impairment," *United States Trust*, 431 U.S. at 20 n. 17, 97 S.Ct. at 1516 n. 17. While such an inquiry would have been relevant then (as now) on the question of whether there has been an impairment at all, *see Energy Reserves*, 459 U.S. at 416, 103 S.Ct. at 707 (Court found no impairment where "[i]n short, ERG's reasonable expectations have not been impaired by the Kansas Act."); *Veix v. Sixth Ward Bldg. & Loan Ass'n*, 310 U.S. 32, 40, 60 S.Ct. 792, 795, 84 L.Ed. 1061 (1940), it would appear to be of little probative value in determining whether a particular impairment is substantial.

changes in statutory deficiency judgment procedures." *United States Trust,* 431 U.S. at 31 n. 30, 97 S.Ct. at 1522 n. 30 (citing cases). It sustained in *Richmond Mortgage & Loan Corp. v. Wachovia Bank & Trust Co.,* 300 U.S. 124, 130, 57 S.Ct. 338, 340, 81 L.Ed. 552 (1937), for example, a state law that "recognize[d] the obligations of [the mortgagee's] contract and his right to its full enforcement but limit[ed] that right so as to prevent his obtaining more than his due." And the Court has approved modifications of contractual provisions on which there could have been no reliance, either because the parties explicitly provided or because they should have recognized, that the particular rights were necessarily subject to legislative impairment. *See supra* note 6 (citing *Energy Reserves* and *Veix* ).

Based upon these authorities, we are confident that, *at the very least,* where the contract right or obligation impaired was one that induced the parties to enter into the contract and upon the continued existence of which they have especially relied, the impairment must be considered "substantial" for purposes of the Contract Clause.

In the employment context, there likely is no right both more central to the contract's inducement and on the existence of which the parties more especially rely, than the right to compensation at the contractually specified level. Accordingly, we believe that the salary reductions at issue constituted a substantial impairment of the employees' contract with the City of Baltimore.[8]

### B.

This does not end the analysis, however. "The Contract Clause is not an absolute bar to subsequent modification of a State's own financial obligations." *United States Trust,* 431 U.S. at 25, 97 S.Ct. at 1519. We must yet "attempt to reconcile the strictures of the Contract Clause with the 'essential attributes of sovereign power' necessarily reserved by the States to safeguard the welfare of their citizens." *Id.* at 21, 97 S.Ct. at 1517 (quoting *Blaisdell,* 290 U.S. at 435, 54 S.Ct. at 239) (citation omitted); *see also id.* 431 U.S. at 23, 97 S.Ct. at 1518 ("In short, the Contract Clause does not require a State to adhere to a contract that surrenders an essential attribute of its sovereignty."); *El Paso,* 379 U.S. at 509, 85 S.Ct. at 584 ("The reserved power cannot be construed so as to destroy the limitation, nor is the limitation to be construed to destroy the reserved power in its essential aspects."); *cf. United States Trust,* 431 U.S. at 23 n. 20, 97 S.Ct. at 1518 n. 20 ("[A] state is without power to enter into binding contracts not to exercise its police power in the future."). As where a government modifies a wholly private contract, a government modification of its own financial obligations must be "reasonable and necessary to serve an important public purpose." *Id.* at 25, 97 S.Ct. at 1519; *see also Energy Reserves,* 459 U.S. at 411, 103 S.Ct. at 704 ("If the state regulation constitutes a substantial impairment, the State, in justification, must have a significant and legitimate public purpose behind the regulation...."); *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 505, 107 S.Ct. 1232, 1252, 94 L.Ed.2d 472 (1987) ("significant and

---

**8.** To the extent that the magnitude of the ensuing economic loss from an impaired contract (as opposed to the nature of the right impaired) is relevant to the question of the substantiality of the impairment, we reject the City's contention that an annual salary reduction of .95% is insubstantial. Based upon an annual salary of $25,-000, this amount could represent a substantial portion of a monthly mortgage or rental payment, or weeks of food. Indeed, because individuals plan their lives based upon their salaries, we would be reluctant to hold that any decrease in an annual salary beyond one that could fairly be termed *de minimis* could be considered insubstantial. *See, e.g., Association of Surrogates v. New York,* 940 F.2d 766, 772 (2d Cir.1991) (A 10% reduction in salary over 20 weeks prompted

court to remark that "[t]he affected employees have surely relied on full paychecks to pay for such essentials as food and housing."), *cert. denied,* ―― U.S. ――, 112 S.Ct. 936, 117 L.Ed.2d 107 (1992) (*"Surrogates"*); *Association of Surrogates v. New York,* 79 N.Y.2d 39, 580 N.Y.S.2d 153, 156, 588 N.E.2d 51, 54 (1992) (10% reduction in salary over 10 weeks "not an insubstantial impairment to one confronted with monthly debt payments and daily expenses for food and the other necessities of life"); *cf. Sniadach v. Family Fin. Corp.,* 395 U.S. 337, 342 n. 9, 89 S.Ct. 1820, 1823 n. 9, 23 L.Ed.2d 349 (1969) ("For a poor man to lose part of his salary often means his family will go without the essentials." (internal quotations omitted)).

legitimate public purpose"); *see also Energy Reserves*, 459 U.S. at 412, 103 S.Ct. at 705 ("The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests."). Neither the teachers nor the police disputes that ensuring the financial integrity of the City is a significant public purpose. Both argue, however, that the furlough plan was neither reasonable nor necessary to achieve this purpose.

■ When a state acts to impair private contracts, "courts properly defer to legislative judgments as to the necessity and reasonableness of a particular measure." *United States Trust*, 431 U.S. at 23, 97 S.Ct. at 1518. Public contracts stand on a somewhat different footing. Because "the State's self-interest is at stake," *id.* at 26, 97 S.Ct. at 1519, these contracts occupy what the Court has termed a "special status" for Contract Clause purposes, *id.*, and must be more scrupulously examined, *see, e.g., Spannaus*, 438 U.S. at 244 & n. 15, 98 S.Ct. at 2722 & n. 15.[9] Unlike with respect to state impairments of private contracts, *"complete* deference" to legislative assessments of the reasonableness and necessity for modifying public contracts is not appropriate. *United States Trust*, 431 U.S. at 26, 97 S.Ct. at 1519 (emphasis added). While complete deference is inappropriate, however, at least some deference to legislative policy decisions to modify these contracts in the public interest must be accord-

ed.[10] *See Continental Ill. Nat'l Bank & Trust Co. v. Washington*, 696 F.2d 692, 701 (9th Cir.) ("Because the State is a contracting party, we give *less* deference to its claims of justification for impairment." (emphasis added, citing *United States Trust*, 431 U.S. at 25–26, 97 S.Ct. at 1519)), *appeal dismissed*, 460 U.S. 1077, 103 S.Ct. 1762, 76 L.Ed.2d 338 (1983); *Local 589, Amalgamated Transit Union v. Massachusetts*, 666 F.2d 618, 643 (1st Cir.1981) (Even in cases involving public contracts, "where economic or social legislation is at issue, some deference to the legislature's judgment is surely called for."), *cert. denied*, 457 U.S. 1117, 102 S.Ct. 2928, 73 L.Ed.2d 1329 (1982). *But cf. Nevada Employees Ass'n, Inc. v. Keating*, 903 F.2d 1223, 1226 (9th Cir.) (Its decisions "do not indicate that the Court would defer to state legislatures when public as opposed to private contracts are at issue."), *cert. denied*, 498 U.S. 999, 111 S.Ct. 558, 112 L.Ed.2d 565 (1990). The district court afforded essentially no deference whatsoever to Baltimore's determinations of the reasonableness and necessity of the salary reductions, *see* J.A. at 351 ("Alternatives always exist to imposing the costs of budgetary shortfalls on a class of contracting parties such as city employees."), and it is at least in part because of this failure that it erred.

■ It is not enough to reason, as did the district court, that "[t]he City *could have* shifted the burden from another governmental program," or that "it *could have* raised

9. The Court consistently has reaffirmed that "impairments of a State's own contracts would face more stringent examination under the Contract Clause than would laws regulating contractual relationships between private parties." *Spannaus*, 438 U.S. at 244 n. 15, 98 S.Ct. at 2722 n. 15 (citing *United States Trust*, 431 U.S. at 22–23, 97 S.Ct. at 1517–18; *Exxon Corp. v. Eagerton*, 462 U.S. 176, 192 n. 13, 103 S.Ct. at 2306 n. 13 (1983) ("The statutes under review in *United States Trust Co.* also implicated the special concerns associated with a State's impairment of its own contractual obligations.").

10. The Court has never expressly stated that any deference is owed legislative judgments in the context of public contract impairment. However, the most reasonable inference one gains from comparing its characterization in *United States Trust* of the deference due legislative judgments in the private contract context, *see* 431 U.S. at 22–23, 97 S.Ct. at 1517–18 (courts properly defer

to such judgments), with that due such judgments in the public contract context, *id.* at 25–26, 97 S.Ct. at 1519 ("complete deference ... is not appropriate"), is that *some* degree of deference is appropriate even where a state acts to impair its own contracts.

Indeed, although the Court has never specified what it intends by the requirement of a more searching examination, it appears to mean by this only that the legislature's asserted justifications for the impairment shall not be given the complete deference that they otherwise would enjoy. *See, e.g., Energy Reserves*, 459 U.S. at 413 n. 14, 103 S.Ct. at 705 n. 14 (stating, after quoting *United States Trust* that complete deference is not required in public contract impairment context, that "stricter standard" of *United States Trust* does not apply because state has not altered its own contractual obligations).

taxes." *Id.* (emphases added). *But see Surrogates*, 940 F.2d at 773. Were these the proper criteria, no impairment of a governmental contract could ever survive constitutional scrutiny, for these courses are always open, no matter how unwise they may be. Our task is rather to ensure through the "necessity and reasonableness" inquiry that states neither "consider impairing the obligations of [their] own contracts on a par with other policy alternatives" or "impose a drastic impairment when an evident and more moderate course would serve its purposes equally well," *United States Trust*, 431 U.S. at 30–31, 97 S.Ct. at 1522, nor act unreasonably "in light of the surrounding circumstances," *id.* at 31, 97 S.Ct. at 1522.

We are satisfied that Baltimore City did neither. Required by law to balance its budget, the City took what we believe to be needed and measured steps to absorb extraordinary reductions in revenue.[11] By October 1991, facing a deficit of some $450 million, the State of Maryland had dramatically decreased funding to local governments for Fiscal Year 1992, with the net effect that Baltimore lost approximately $24.2 million in state aid. In response to these cuts, the City, which was already suffering from the sluggish economy and poor financial management, not only abandoned previously negotiated pay raises but also effected other nonsalary cost savings. Because personnel costs constitute such a large percentage of its expenditures (for example, 91.8% of the Police Department budget and 82.5% of the Public School budget), however, Baltimore was also forced to resort to such measures as layoffs, job abolishments, and early retirements.

In December 1991, nearly midway through the fiscal year, the State proposed an eleventh-hour, second round of cuts in state aid to the City, totaling approximately $13.3 million. Only then, and only in order to maintain its budget in balance and avoid further layoffs, did the City resort to the furlough plan at issue here.[12] The City's obvious reluctance to resort to the plan and its decision to do so only when it concluded that it had no better alternative belies the "political expediency" suspected in *Surrogates*, 940 F.2d at 773, and confirms that the City did not consider salary reductions on a par with other policy choices, *see United States Trust*, 431 U.S. at 29–31, 97 S.Ct. at 1521–22.

Nor on such facts as these can we conclude that the City chose a drastic impairment over an equally acceptable, more moderate course. First, the amount of the reduction was no greater than that necessary to meet the anticipated shortfall. *See United States Trust*, 431 U.S. at 29–30, 97 S.Ct. at 1521 (criticizing "total repeal" of bond covenant when "a less drastic modification would have permitted the contemplated plan without entirely removing the covenant's limitations"). Second, the city discontinued the plan immediately upon recognition that the budgetary shortfall would not be so great as anticipated. *See Energy Reserves*, 459 U.S. at 418, 103 S.Ct. at 708 (noting approvingly that "the Act is a temporary measure that expires when federal price regulation of certain categories of gas terminates."). Finally, the plan did not alter pay-dependent benefits, overtime pay, hourly rates of pay, or the orientation of pay scales. *See United States Trust*, 431 U.S. at 27, 97 S.Ct. at 1520 ("The extent of impairment is certainly a relevant factor in determining its reasonableness."). Indeed, the plan was less drastic than at least one alternative, additional layoffs, which could have been more detrimental to appellees. *See Faitoute Iron & Steel Co. v. City of Asbury Park*, 316 U.S. 502, 516, 62 S.Ct. 1129, 1136, 86 L.Ed. 1629 (1942) (upholding law affecting municipal bond terms in part because it benefitted the bond holders); *see also* Reply Br.

---

**11.** The public purpose justifying an impairment of contract need not be "an emergency or temporary situation," although the existence of an emergency is of course relevant. *Energy Reserves*, 459 U.S. at 412, 103 S.Ct. at 705; *see also Spannaus*, 438 U.S. at 249 n. 24, 98 S.Ct. at 2725 n. 24 ("This is not to suggest that only an emergency of great magnitude can constitutionally justify a state law impairing the obligation of contracts.").

**12.** The salary reduction was but one of a number of the measures taken by the City. Additional features of its plan included "the use of the Fiscal 1991 General Fund balance; interest cost savings due to a delay in going to the bond market; rent from the Orioles, and anticipated proceeds from the sale of City property." J.A. at 35.

at 13 ("Appellees advance no basis for disputing the fact that the pay reduction was an alternative, presumably a preferred alternative, to layoffs."). In short, the City clearly sought to tailor the plan as narrowly as possible to meet its unforeseen shortfalls.

We also conclude that the salary reductions were reasonable under the circumstances. In addition to its careful tailoring, the furlough plan possessed, not insignificantly, each of the attributes identified in *Spannaus* as present in various state laws that had impaired private contracts but survived Contract Clause challenge. First, the plan was designed to "deal with a broad, generalized economic or social problem." 438 U.S. at 250, 98 S.Ct. at 2725 (citing *Blaisdell,* 290 U.S. at 445, 54 S.Ct. at 242); *see also Exxon,* 462 U.S. at 191, 103 S.Ct. at 2306 (noting approvingly that the statute "did not prescribe a rule limited in effect . . . , but instead imposed a generally applicable rule of conduct designed to advance 'a broad societal interest' " (quoting *Spannaus,* 438 U.S. at 249, 98 S.Ct. at 2724)); *id.* 462 U.S. at 192, 103 S.Ct. at 2306 ("main effect" of Act was "shielding consumers").[13] Indeed, according to the City, prior to implementation of the furlough plan, "[i]t was approaching the point where it [had] to begin cutting basic services and initiating the breakdown of government." Appellants' Br. at 21.

Similarly, unlike the special interest character of the legislation at issue in *Spannaus,* Baltimore's plan did not narrowly target specific classes of employees; it extended to all City employees. *See Exxon,* 462 U.S. at 176, 103 S.Ct. at 2296 ("The prohibition applied to all oil and gas producers. . . ."); *id.* 462 U.S. at 192, 103 S.Ct. at 2306 ("sharply distinguish[ing]" *United States Trust* and *Spannaus* because the measures at issue there imposed no "generally applicable rule of conduct"); *Energy Reserves,* 459 U.S. at 412 n. 13, 103 S.Ct. at 705 n. 13 ("The pension statute [in *Spannaus* ] had a very narrow

focus: it was aimed at specific employers."); *Spannaus,* 438 U.S. at 248, 98 S.Ct. at 2724.

Third, the plan affected reliance interests not wholly unlike those of private entities in regulated industries, which contract subject to future, additional regulation. *See, e.g., Energy Reserves,* 459 U.S. at 416, 103 S.Ct. at 707; *Spannaus,* 438 U.S. at 250, 98 S.Ct. at 2725 (law affected "an area already subject to state regulation" (citing *Veix,* 310 U.S. at 38, 60 S.Ct. at 794)); *see also Exxon,* 462 U.S. at 194 n. 14, 103 S.Ct. at 2307 n. 14 ("Our conclusion is buttressed by the fact that appellants operate in industries that have been subject to heavy regulation."). Public employees—federal or state—by definition serve the public and their expectations are necessarily defined, at least in part, by the public interest. It should not be wholly unexpected, therefore, that these public servants might well be called upon to sacrifice first when the public interest demands sacrifice.

Finally, the plan "effect[ed] simply a temporary alteration of the contractual relationships of those within its coverage." *Spannaus,* 438 U.S. at 250, 98 S.Ct. at 2725 (citing *United States Trust,* 431 U.S. at 22, 97 S.Ct. at 1517); *United States Trust,* 431 U.S. at 22 n. 19, 97 S.Ct. at 1518 n. 19 ("limited duration" of impairment is factor in reasonableness determination). The City, as noted, immediately discontinued the plan at the first opportunity and correctly does not suggest that it would be free to employ salary reductions as a common budgetary tool in the future.

\*    \*    \*

■ The authority of the states to impair contracts, to be sure, must be constrained in some meaningful way. The Contract Clause, however, does not require the courts—even where public contracts have been impaired—to sit as superlegislatures, determining, for example, whether it would have been more

---

**13.** Whether the changed circumstances that prompted an impairment were changes in degree or in kind is relevant to whether the impairment was reasonable. *See, e.g., United States Trust,* 431 U.S. at 31–32, 97 S.Ct. at 1522. To the extent the City was aware of its precarious financial condition and of possible reductions in state

aid when it enacted its budget, however, we believe that the magnitude of the reductions in state aid rendered the budgetary shortfall that gave rise to the salary reductions tantamount to a difference in kind from one the City might otherwise have anticipated.

appropriate instead for Baltimore to close its schools for a week, an option actually considered but rejected, or to reduce funding to the arts, as appellees argue should have been done. Not only are we ill-equipped even to consider the evidence that would be relevant to such conflicting policy alternatives; we have no objective standards against which to assess the merit of the multitude of alternatives. While the Court today presumably would not accept in the public contract context the absoluteness of Justice Frankfurter's response to a similar request in a private contract context that the Court reject a governor's and legislature's determination that the state's public welfare required further suspension of mortgage foreclosures (or at least not the implication of his response), his essential point is relevant in both contexts: "Merely to enumerate the elements that have to be considered [in determining whether the public welfare decision was reasonable] shows that the place for determining their weight and their significance is the legislature not the judiciary." *East New York Sav. Bank v. Hahn,* 326 U.S. 230, 234, 66 S.Ct. 69, 71, 90 L.Ed. 34 (1945).

In light of the magnitude and timing of the proposed cuts in state funding that prompted the City's salary reductions, the undisputed legitimacy of the City's need to balance its budget, the City's concerted efforts to exhaust numerous alternative courses of cost reduction before resorting to the challenged reductions, the circumscribed nature of the furlough plan, and the City's immediate abandonment of the reductions at the first opportunity, we believe—according the legislature some deference but without accepting its assertions uncritically—that Baltimore's plan was, as it must be, "upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption." *United States Trust,* 431 U.S. at 22, 97 S.Ct. at 1518. Accordingly, we conclude that the City's modification of its employees' contracts was an impairment permitted by article 1, section 10.[14]

## CONCLUSION

For the reasons set forth above, the judgment of the district court is reversed, and the case is remanded for further proceedings consistent herewith.

*REVERSED AND REMANDED.*

WIDENER, Circuit Judge, concurring:

I agree with the majority that the district court should be reversed. I also agree that the claims which were not considered by the district court should be remanded.[1] See op. at 1022 n. 14. I write separately, however, to note my disagreement with the majority's view that the contracts were impaired. Because I believe that the terms of the Memoranda of Understanding between the City and the police unions and the terms of the collective bargaining agreements between the City and the teachers' unions necessarily included the statutory and charter authorization for the Board of Estimates' actions, I would not reach the impairment issue. Simply put, I do not believe there was any impairment of the contracts, the police for either of two reasons, the teachers for one.

I

The majority correctly notes that contracts generally, as those at issue do, are understood to incorporate existing law, including city charters. Op. at 1015. Section 2(g) of the Baltimore City Charter provides:

14. We remand this case to the district court for consideration of several issues it mistakenly believed the parties had abandoned. *See* J.A. at 342 n. 3 ("Several issues raised in the initial cross motions for summary judgment appear to have been abandoned."); Appellants' Br. at 2 n. 1 ("The parties have agreed that the Plaintiffs did not abandon any of their claims...."); *see also Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below."). Our disposition of this case renders moot, however, the State of Maryland's appeal from the district court's denial of its motion for leave to intervene, and accordingly we decline to review that ruling.

1. Neither the majority nor I express an opinion on whether the district court has jurisdiction to hear the remaining claims. If such jurisdiction is claimed and is discretionary, neither expresses an opinion on whether the district court should exercise it.

No temporary loan shall be authorized or made to pay any deficiency arising from a failure to realize sufficient income from all sources to meet the amounts provided in the Ordinance of Estimates.... In case of any such deficiency the Board of Estimates shall effect reductions (which need not be pro rata) in appropriations other than those for payment of the principal and interest of the City debt and such amounts as are fixed by law and contained in said Ordinance of Estimates, except to the extent that the City Council shall, upon the recommendation of the Board of Estimates, enact an ordinance which shall supply revenues to meet all or any part of such deficiency.

City of Baltimore, Md. Charter Art. VI, § 2(g). The question before us, then, is whether the Board of Estimates' adoption of the furlough plan was action authorized by section 2(g).

The context in which the City was acting is pertinent to this dispute. The record in this case reveals that the Budget Reconciliation Act of 1992, which contained a $4.78 million cut to the City, was approved by the Governor on October 18, 1991. The October cut brought the total reduction in state aid to Baltimore City for fiscal year 1992 to about $24.2 million. The City took action to offset the state aid cuts, including layoffs, job abolishments, and early retirements, but it did not implement the furlough program complained of here. In December, new legislation, the Second Budget Reconciliation Act, was pending in the legislature that contained further cuts in state aid. The proposed bill, House Bill No. 458, authorized additional cuts in state aid to the City of $13.3 million. In light of the bill, the City took steps to develop and implement the furlough plan. The furlough plan was implemented in January, 1992, after the Board of Estimates approved it on January 16. It is important to note that the City was taking action because of the anticipated cuts still pending in the legislature. Gallagher Affidavit at ¶ 8. However, when the Second Budget Reconciliation Act was passed by the Maryland legis-

lature in April, it contained much smaller cuts, $4,676,957, than the bill pending in December and January. The City then halted the furlough plan "because of the drop in magnitude of the final installment of State revenue reductions to the City, and an estimate that the payroll savings accrued during the [time the plan was in effect] may be sufficient, along with the non-labor savings [implemented earlier], to deal with the City's General Fund problem for Fiscal Year 1992." Gallagher Supplemental Affidavit of May 11, 1992 at ¶ 8.

The district court's opinion did not mention the City Charter, and the majority argues that Section 2(g) is not authority for the Board's action. The majority arrives at this conclusion because it decides Section 2(g) does not confer upon the Board the power to modify contracts. As did the district court, the majority has viewed this case from the beginning as a case of impairment of a contract under the contracts clause, and has not recognized that the City's Charter provisions confer upon the Board the authority to reduce appropriations in whatever manner necessary, even if the obligation exists by virtue of a contract. The grant of power is broad and is not held by any other body of city government. The only restrictions upon the Board are that it must pay the city debt and it must pay those amounts fixed by law. The Board does not even have to reduce appropriations pro rata. City of Baltimore, Md. Charter Art. VI, § 2(g). The amounts reduced here are not fixed by law, but by contract; they are not a part of the City's debt. Although not explicit in the majority's opinion, it apparently has decided that the Board's initial adoption of appropriations in the amounts set forth in the Memoranda of Understanding somehow confers on these appropriations a special status. See op. at 1015–16. However, if that were true, every amount contained in the Ordinance of Estimates would be sacred, and the provision in the Charter would be meaningless.

The majority further argues that Section 2(g) does not apply to the fact situation here.[2] On that point, it states:

2. The majority also argues that it is not clear whether the furlough plan constituted a reduc-

tion in appropriations, which is the only action that Section 2(g) grants to the Board. Op. at

[Section 2(g) ] authorizes reductions in appropriations only in the event of a "deficiency." At the time the furlough plan was adopted in January, however, the Maryland General Assembly had yet to authorize the Governor to effect the anticipated cuts in funding to the City, an event which did not occur for several months—and even then in amounts different from those originally contemplated.

Op. at 1016 n. 4. That reasoning overlooks that there already was a deficiency from the first cuts and that, in the end, there was a second cut. It is irrelevant what the size of the deficiency was; all that was necessary for the Board to act was a deficiency. The City could have cut the labor costs at issue here much earlier, but instead chose to wait and try other methods. The City also knew that it would have to take much more drastic· action than the furlough plan if it did not act on the anticipated $13.3 million cut as soon as possible, because the cuts were for the current fiscal year. Gallagher Affidavit at ¶ 8. The City's actions thus were not only authorized, they also were most sensitive to the employees' needs. The majority seems to argue, however, that the Board should have waited and laid off employees in April rather than attempting to address the issue in a less harsh manner as early as it could. I simply do not agree with that suggestion. I think the· Board acted reasonably, lawfully, and with as little harshness as possible in quite difficult circumstances.

## II

As to the police union Memoranda, I also believe the majority was mistaken in limiting its discussion, of whether the City or the Board of Estimates had the power to modify contracts, to those powers conferred by the City Charter. The power of the Board of Estimates to modify the appropriations in this case did not come only from the Charter, but also was conferred by the legislation authorizing the City to take appropriate action to deal with the budget shortfalls that were anticipated because of the decrease in state aid. See Budget Reconciliation Act for Fiscal Year 1992 § 9(a) which provides:

> Subject to the provisions of subsection (b) of this section [not applicable here], the governing body of a county or Baltimore City, or other legal entity or authority within the county or Baltimore City, may take any action necessary, including any action to reduce a previously approved appropriation, to prudently manage its fiscal affairs and to meet its obligations under this Act. This subsection may not be interpreted to authorize additional taxation authority.

The facts in this case reveal that the Memoranda of Understanding between the police unions and the City were entered into after the passage of the Budget Reconciliation Act for fiscal 1992 which authorized the City's furlough plan. The record is that the Budget Reconciliation Act was approved by the Governor on October 18, 1991. The Memoranda of Understanding for the police unions were signed on November 19, 1991.[3] Therefore, when the parties signed the Memoranda for the police, they were aware of a shortfall in state aid and that the City had been authorized to "take any action necessary, including any action to reduce a previously approved appropriation," under Budget Reconciliation Act § 9(a), to deal with the shortfall. Still, the City prudently waited. It was only in December, when the Second Budget Reconciliation Act was pending in the legislature, which contained even more cuts in state aid, that the City took steps to develop and implement the furlough plan.

The case before us, then, is that the City was granted authority to deal with reductions in the state aid appropriations in the Budget Reconciliation Act, and used that authority when it learned of the massive cuts anticipated in the Second Budget Reconciliation Act. When those massive cuts did not turn out to be as large as feared and threatened, the

---

1016, n. 4. Had the majority considered the actions of the Board to be a reduction in appropriations, of course, that issue would not have remained in the case upon which to rest a finding of impairment.

**3.** The agreement for the teachers' unions were apparently entered into in 1989, before the passage of the Act. Thus the teachers' contracts are not subject to the Act.

City stopped the furlough plan. And, the police unions now complaining of the furlough plan knew that the Governor had signed into law the City's authority to deal with the reductions before they signed the Memoranda of Understanding with the City.

It is axiomatic that the Constitution grants no entitlements to government benefits. See, e.g., *Harris v. McRae*, 448 U.S. 297, 316–318, 100 S.Ct. 2671, 2687–88, 65 L.Ed.2d 784 (1980) (Congress may choose to provide Medicare funds for medically necessary abortions, but not elective abortions). The ability of the State of Maryland to change the appropriation to the City was known as a matter of law by all of the parties, and the grant to the City of authority to reduce funds already appropriated also had been made. This was part of the law that necessarily was incorporated into the Memoranda of Understanding signed by each of the appellee police unions. The City and the police unions took the risk of negotiating agreements and fixing budgets that relied on State aid without knowing whether that aid would materialize in the necessary amount and, in fact, had been warned that it likely would not. When it was threatened that even further deep cuts would be made by the Second Budget Reconciliation Act, adjustments had to be made. For the police unions now to argue that the City cannot adjust its appropriations downward when the budget and those appropriations were calculated on the basis of funds that the City did not receive defies logic as well as law in light of the legislative grant which was known to all parties before the Memoranda were signed.

The district court based its analysis on finding a contract and an impairment. When it finally reached the constitutional argument as to the validity of § 9(a) of the statute, the district court considered it under the federal constitution and did not reach that issue until after it had found an unconstitutional impairment. It seems to me, however, that the appropriate analysis should start with the source of the City's power to implement the policy at issue.[4]

### III

In sum, I believe that the actions of the City with respect to the shortfall in funds were authorized by the plain words of section 9(a) of the Budget Reconciliation Act of 1992 as to the police union. As to both the police union and the teachers' union, I believe the plain words of the City Charter apply and give the City the authority to do just what it did. I see no reason to depart from the language of Section 9(a) of the statute and the Charter, each of which is quite clear, I think.

I do not think there is any impairment of a contract in the constitutional sense because the actions taken by the City were authorized by the statutory and charter provisions I have quoted above. Whether there is any cause of action under state law is a question on which I express no opinion.

---

**4.** The majority's discussion of Section 9(a) in footnote 5 of its opinion overlooks two very important facts: The Neall Amendment had been passed *before* the police unions ever signed their Memoranda with the City, and all contracts are understood to incorporate pre-existing law. The majority admits as much in its opinion, but then argues in footnote 5 that pre-existing law incorporated into a contract can violate the Contracts Clause of the Constitution. This would achieve the result of a contract which is formed after the passage of a statute rendering the statute void as against the Contracts clause. Surely this cannot be the case.

In addition, if there were a doubt about whether the contract really should be subject to a pre-existing law, one need only to look to the Supreme Court for the answer:

But into all contracts, whether made between states and individuals, or between individuals only, there enter conditions which arise, not

only out of the literal terms of the contract itself; they are superinduced by the pre-existing and higher authority of the laws of nature, or nations, or of the community to which the parties belong; they are always presumed, to be known and recognized by all, are binding upon all, and need never therefore be carried into express stipulation, for this could add nothing to their force. Every contract is made in subordination to them, and must yield to their control, as conditions inherent and paramount, wherever a necessity for their execution shall occur.

*Long Island Water Supply Co. v. City of Brooklyn*, 166 U.S. 685, 692, 17 S.Ct. 718, 721, 41 L.Ed. 1165 (1897). The above-quoted passage is also quoted in *Home Building & Loan Association v. Blaisdell*, 290 U.S. 398, 435–36, 54 S.Ct. 231, 239, 78 L.Ed. 413 (1934), on which the majority relies.

## AMENDED ORDER

### ON PETITION FOR REHEARING WITH SUGGESTION FOR REHEARING IN BANC

#### Oct. 12, 1993.

Appellees Baltimore Teachers Union, American Federation of Teachers Local 340, AFL–CIO and the City Union of Baltimore, American Federation of Teachers, Local 800, AFL–CIO have filed a petition for rehearing with suggestion for rehearing in banc and appellants filed an answer to the petition. A member of the Court requested a poll on the suggestion for rehearing in banc, and a majority of the judges voted to deny rehearing in banc. Judge MURNAGHAN voted to rehear the case in banc. Chief Judge ERVIN, Judges RUSSELL, WIDENER, HALL, PHILLIPS, WILKINSON, WILKINS, NIEMEYER, HAMILTON, LUTTIG and WILLIAMS voted against rehearing in banc.

The original judicial panel voted to deny the petition for rehearing.

The Court denies the petition for rehearing with suggestion for rehearing in banc.

MURNAGHAN, Circuit Judge, dissenting from denial of petition for rehearing *en banc:*

I have, albeit unsuccessfully, voted for rehearing *en banc* and dissent from its denial.

The case involves negotiations whereby members of the Baltimore City police department and public school teachers of the same municipality worked out agreements as to wages with City representatives, subject to recommendation by the City's Board of Estimates and adoption by the City Council in the annual budget. Said recommendation by the Board of Estimates and adoption by the City Council occurred.

During the year involved, there was a shortfall in expected revenue. The State of Maryland reduced its appropriation to the City. The City moved to remain within balanced budget requirements and decided not to honor in all respects the contractual promises made to the police and to the teachers. Two of the three members of the panel rendering the decision which I have wished should be reheard *en banc* constituted the majority and decided that a substantial impairment of contract resulted from the consequent reduction in salary paid from what had been promised.

The constitutional proviso against impairment of contract, U.S. Const. art. I, § 10, cl. 1 ("No State shall ... pass any ... Law impairing the Obligation of Contracts...."), applies to a corporate municipality such as Baltimore City. *See Northern Pac. Ry. Co. v. Minnesota,* 208 U.S. 583, 590, 28 S.Ct. 341, 343, 52 L.Ed. 630 (1908) (stating that it is not "open to question" that the Contract Clause applies to municipal legislation). Substantial contract impairment by a state or municipality is permissible only if 1) reasonable and 2) necessary. *See United States Trust Co. v. New Jersey,* 431 U.S. 1, 25, 97 S.Ct. 1505, 1519, 52 L.Ed.2d 92 (1977) (holding that the Contract Clause prohibits a substantial impairment of a contractual relationship unless the impairment "is reasonable and necessary to serve an important public purpose").*

The panel majority determined that deference should be accorded to the Board of Estimates, which ordered the reduction in pay (*i.e.,* breaches of contract), treating such orders as legislative in nature although the City Council did not make or approve them. The fact that the Board of Estimates engages somewhat in what amounts to part of the legislative process, and therefore has freedom from the obligation to testify, *see Baker v. Mayor and City Council of Baltimore,* 894 F.2d 679, 682 (4th Cir.), *cert. denied,* 498 U.S. 815, 111 S.Ct. 56, 112 L.Ed.2d 31 (1990), does not elevate its steps to the dignity of actual legislation. But whether the breach of contract was legislative or not,

---

* In defending the supposed "reasonableness" of the City's salary reductions, the panel incorrectly asserted that "Baltimore's plan ... extended to *all* City employees" and thus constituted a generally applicable rule untainted by any "special interest character." Op. at 1019–21 (emphasis added) (citation and internal quotation marks omitted). But, as the opinion elsewhere acknowledged, the plan did not apply to "firefighters, who enjoy certain privileges." *Id.* at 1025.

Moreover, a truly general impairment of contract applying exclusively to *injure* employees, would still be, in a monetary sense, for the *benefit* of the employer, the City.

it was not proper, in any event, as legislation. The pay reduction impairing contractual undertakings was an improper abdication of the responsibility to see that the federal constitution is complied with. The City should have considered several items in the budget which could have been cut, without any impairment of contract occurring, thereby insuring that the budget would be balanced. Besides issuance of bonds, reduction of support for cultural institutions comes immediately to mind. The City, disliking such cuts, even though they would not represent breaches of contract, could alternatively impose taxes to meet the reduction in state revenues allocated to the City which would be at a level not equaling the highest level reached by the City in the past.

What was done was by no means necessary. Its reasonableness is quite dubious. At most, it minimized somewhat the political dissatisfaction of Baltimore voters which could be expected by City Council members if funding for cultural activities were reduced or taxes were raised. The pay reduction, though it clearly impaired the obligation of contract, could only benefit the political interest of City Council members who regularly must run for reelection. To avoid what politics would have rendered unpopular, Baltimore City chose to ignore, that is to break, contracts and thereby to interfere quite unfavorably with the bargained rights, namely the livelihood of important city workers, the police and public school teachers. *See Association of Surrogates & Supreme Court Reporters v. New York ("Surrogates I"),* 940 F.2d 766, 773 (2d Cir.1991) ("In fact, the [scheme at issue here] smacks of the political expediency that *United States Trust Co.* warned of: 'A governmental entity can always find a use for extra money, especially when taxes do not have to be raised.' " (quoting *United States Trust Co.,* 431 U.S. at 26, 97 S.Ct. at 1519)), *cert. denied,* —— U.S. ——, 112 S.Ct. 936, 117 L.Ed.2d 107 (1992); *cf. Association of Surrogates & Supreme Court Reporters v. State ("Surrogates II"),* 79 N.Y.2d 39, 47, 580 N.Y.S.2d 153, 156, 588 N.E.2d 51, 54 (1992) (noting that the deferral of state employees' salaries was "not an insubstantial impairment to one confronted with monthly debt payments and daily ex-

penses for food and the other necessities of life"). The two-member panel majority opinion infringes on the holdings in *Condell v. Bress,* 983 F.2d 415, 419–20 (2d Cir.) (holding that a December 1990 statute deferring state employees' salary payments violated the Contract Clause because it was not reasonable and necessary to further an important public purpose), *cert. denied,* —— U.S. ——, 113 S.Ct. 1849, 123 L.Ed.2d 473 (1993); *"Surrogates I",* 940 F.2d at 773 (holding that a May 1990 statute deferring state employees' salary payments was "in no way 'necessary' to the achievement of the [state legislature's] stated goals"); *"Surrogates II",* 79 N.Y.2d at 46, 580 N.Y.S.2d at 156, 588 N.E.2d at 54 (holding unanimously that a 1991 statute deferring state employees' salary payments was not "reasonable and necessary to accomplish the State's purposes"); and *Carlstrom v. State,* 103 Wash.2d 391, 396–97, 694 P.2d 1, 5–6 (1985) (holding unanimously that a state statute canceling teachers' contractual salary increases violated the Contract Clause because it was not reasonable). *See also Opinion of the Justices,* 135 N.H. 625, 636, 609 A.2d 1204, 1211 (1992) (concluding unanimously that a "furlough" bill requiring certain state employees to take unpaid leave would violate the Contract Clause because it would be "neither reasonable nor necessary to serve an important public purpose"); *cf. Sonoma County Org. of Pub. Employees v. County of Sonoma,* 23 Cal.3d 296, 313–14, 152 Cal.Rptr. 903, 912–13, 591 P.2d 1, 10–11 (1979) (holding that a state statute capping local governmental employees' contractual cost-of-living wage increases violated the Contract Clause because the state's supposedly "grave fiscal crisis" did not actually constitute a significant and legitimate public purpose).

There is thus substantial authority, federal and state, appearing to contradict the opinion of the two-judge panel majority. A conflict of circuits emerges on an item of potentially immense importance. Accordingly, I dissent from the denial of *en banc* rehearing.